BRUCE F. EVERTSON, APPELLANT, V. ROBERT D. CANNON ET AL.,
APPELLEES.
411 N.W.2d 612

Filed September 4, 1987.   No. 85-679.

Donald J. Tedesco, and W. Perry Dray of Dray, Madison & Thomson, P.C., for appellant.

Steven C. Smith and Thomas D. Brower of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, P.C., for appellees Robert D. Cannon, Elaine Cannon, and Marilyn Caldwell.

Gerald E. Matzke of Martin, Mattoon, Matzke & Mattoon, for appellees Dale Cannon, Eileen Evertson, and Arlene Meredith.

BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

BOSLAUGH, J.

This case involves a dispute concerning several oil leases in

Morrill County, Nebraska. The plaintiff, Bruce F. Evertson, claims an interest in the leases on the theory that he was engaged in a joint venture with the principal defendant, Robert D. Cannon, who will be referred to as the defendant. The other defendants include various members of the Cannon family: his father, Dale Cannon; his wife, Elaine Cannon; two sisters, Eileen J. Evertson and Arlene C. Meredith; and his mother-in-law, Marilyn J. Caldwell. The defendant's sister, Eileen J. Evertson (Jeannie), was formerly married to the plaintiff.

The record shows that in 1981 or 1982, the defendant, who was engaged in the oil well service business with the plaintiff, decided that he wanted to acquire some oil production. The defendant and his father were acquainted with an oil well known as the "Exeter well" which was unusual because it had produced a large amount of oil over a period of years from only 2 feet of pay sand. The defendant's father had acquired the Matador unit, which was located just west of the Exeter well. The leases on the land to the north and east of the Exeter well were held by the Gulf Oil Co. The defendant acquired a farmout agreement from Gulf which would give him the right to drill wells on a 200-acre tract if he drilled a producing well in the tract.

A well known as the Willson-State No. 1 was the first well drilled under the farmout agreement, and it proved to be a producing well. The defendant acquired additional leases on land adjacent to the 200-acre tract, and additional wells were drilled.

The plaintiff commenced this action to impose a constructive trust on the leases obtained by the defendant from Gulf and on land adjacent to the 200-acre tract. The plaintiff contends the parties had an agreement to pursue the entire project as joint venturers. The defendant contends the plaintiff's interest in the project was limited to an interest in the first well.

The trial court found generally in favor of the defendant and dismissed the petition. The court found specifically that the plaintiff had failed to prove his case; that the statute of frauds was applicable to the transaction; that there was no written contract between the parties and no fiduciary relationship between them; and that there was no proof of a joint venture.

The court found that the defendant was not a constructive trustee of the oil and gas leases and that the evidence presented by the plaintiff was not clear and convincing.

The plaintiff has set forth seven assignments of error, but has failed to brief the assignments of error concerning the release of approximately $600,000 prior to trial and the contention that the trial court erred in overruling the motion for a new trial. Accordingly, those assignments of error will not be discussed. Neb. Ct. R. of Prac. 9D(1)d (rev. 1986). See, also, *In re Interest of R.A. and V.A.*, 225 Neb. 157, 403 N.W.2d 357 (1987). The remaining assignments of error, in essence, contend the trial court erred in finding that there was no agreement between the parties to acquire acreage for exploration and development, that the statute of frauds applied to any agreement between the parties, and that there was no joint venture with respect to the Gulf farmout acreage and the adjacent additional acreage.

The plaintiff contends that since the trial court found there was a fiduciary relationship with regard to the first well, the court should have found such a relationship existed as to the other leases. This contention is without merit. The trial court specifically stated, when overruling the motion for new trial, "[O]nce Mr. Cannon gave Mr. Evertson the 30% interest in the first well, he became a fiduciary with respect to the *operation* of that first well. . . . [O]nce that was given, there was a joint venture to that extent in the first well . . . ." (Emphasis supplied.)

The plaintiff next contends the evidence was sufficient to support a finding that a fiduciary relationship existed as to all of the leases because the parties were joint venturers. The plaintiff argues there was a community of interest and common purpose between the parties and that his claim is supported by the evidence, which included evidence of custom in the industry. The plaintiff further argues that the parties had an oral agreement concerning the venture, that the actions of the parties support a finding that such an agreement existed, that such informal agreements are common in the industry, and that it is an uncommon practice to split a 40-acre segment out of a larger acreage, as the defendant did in this case.

The following is a summary of the evidence presented at the

trial.

The plaintiff testified that he hired the defendant to work for Evertson Well Service, Inc., in 1975. The two men had previously worked together for C & C Well Service, a firm owned by Dale Cannon. The defendant became a part owner of Evertson Well Service, Wyoming, in 1976, and ran the day-to-day operations of that business. The two men later formed Evertson Oil and Gas Well Service and owned equal shares in that company. The two men personally guaranteed a line of credit to enable the corporation to purchase needed equipment, and bought out the other stockholders in 1979. The defendant supervised the rigs in southwest Wyoming, and the plaintiff supervised the rigs in the area of the D-J basin in Nebraska. The two men had known each other for about 20 years.

The plaintiff described their relationship as being "[v]ery, very close" and stated that he trusted the defendant, had confidence in his abilities, and relied on him in their business operations through 1982. The plaintiff testified both men had interests in other businesses and were not jointly interested in all of each other's affairs.

The plaintiff testified that a "working interest owner" pays for his interest in a leasehold, pays his share of the monthly bills, and receives some percentage of the oil and gas production. He testified that a royalty interest is an overriding interest in production which does not require the payment of costs.

The plaintiff testified that the two men had entered into oral agreements in the past as a normal course of conduct and that it was a usual and customary practice in the industry to send working interest owners bills which indicated the proportionate share of expenses.

The plaintiff testified that from June 1982 to May 1983, the personal relationship between the two men was "the same as it had always been. We were partners and very close." He testified that they began to discuss offsetting the Exeter well in the summer of 1982. It had been his understanding they would undertake the project as equal partners. According to the plaintiff, the defendant subsequently discussed the project with a geologist, Alexander Boardman, who advised them as to the

best spot on which to drill or offset the Exeter well and that Gulf held the leases on that acreage. The defendant then determined Gulf did control the land, and eventually contacted Gulf and obtained an offer for a farmout agreement. A farmout agreement is one in which the owner or lessor who does not wish to drill conditions an economic interest in the lease upon the drilling of a producing well on the property by another party. The deal was confirmed by Gulf in November 1982, and the written farmout agreement was received by the defendant in December of that year.

The farmout agreement provided that if a producing well was drilled on the property, Gulf would retain an 8-percent override on the lease, and the defendant would have the right to drill on the 200 additional acres. After the plaintiff was informed Gulf had approved the farmout agreement, he contacted several drilling contractors to bid on the well and sent one of his employees to examine the site. He then contacted a dirt contractor, and a drill site was chosen. The drilling contract identifies the parties as "Evertson & Cannon" and "Banner Drilling Company." A notice of intent to drill was filed with the state November 30, 1982. The operator of the well was listed as Evertson Well Service, Inc. The well was identified as Willson-State No. 1. Drilling commenced December 3, 1982, and proceeded normally. The two men discussed which pipe casing would be appropriate, and the plaintiff ordered it. The plaintiff testified that Dale Cannon was never on the site and did not make decisions regarding running the pipe.

At some point the geologist gave the two men his recommendations concerning perforating the well and the advisability of obtaining additional acreage. The plaintiff asked a business acquaintance, Ebb Lueck, to contact a landman, and Lueck then contacted Tommy Lee. Lee recommended that Lee obtain a "top lease" on certain property and later assign it to the parties. The plaintiff testified they agreed to follow Lee's recommendations. The parties then determined the proper place to perforate the well, without any help from Dale Cannon, and the well was completed. The parties determined what equipment was necessary and made all of the arrangements for the well, again, without the assistance

of Dale Cannon.

In early December 1982, when the plaintiff learned the defendant had not actually received the farmout agreement itself, but had only a letter of intent from Gulf, he contacted his attorney regarding the matter. The drilling expenses were later paid by the defendant's and plaintiff's accountant, in late December 1982. At some point the defendant decided he wanted to be the operator of the well and began to process all of the bills himself. The bills from the well, which included invoices made out to Dale Cannon, were received in evidence.

The plaintiff testified he received an invoice which disclosed his working interest in the well in early January 1983, which he paid by a check dated December 28, 1982. He testified that he was not aware that his interest was listed as 30 percent at that time, but assumed it was approximately 48 percent until he received his second bill in January 1983. The plaintiff stated he confronted the defendant about the discrepancy and was told the latter had decided to let his dad in on the deal. The plaintiff testified he told the defendant to "straighten it out." Subsequent invoices continued to show the plaintiff's interest as 30 percent.

The plaintiff testified that he realized there was a problem with the farmout acreage in June 1983, when his attorney notified him that the defendant had assigned an interest to him in only the first well. The plaintiff learned the defendant had top-leased additional acreage in his own name during that same time. The plaintiff believed this was contrary to the parties' earlier agreement with Tommy Lee. Further, the plaintiff was not offered a chance to participate in a well subsequently drilled on the Gulf farmout acreage and stated that his offer to pay his share of the drilling costs of that well was refused. Also, the plaintiff was refused participation in wells drilled on acreage subsequently acquired by the defendant.

The plaintiff testified his offer to pay a proportionate share of expenses was contained in a letter from his attorney to the defendant. The letter concerned the East Matador land, Gulf farmout land, and adjoining acreage. The plaintiff testified that in the letter he had asked for a 30 percent share because he was still hoping the matter could be settled without resort to

litigation, but when litigation was the only possible avenue he decided to sue on the terms of the original deal.

The plaintiff testified he was active in the search for and negotiations with the ultimate purchaser of the oil and that Dale Cannon had not been involved in such negotiations. The plaintiff further testified that immediately prior to his divorce settlement his relationship with the defendant changed drastically. He stated there was also a problem when the defendant quit working for him during the last week in February 1983. The plaintiff testified that Arlene Meredith, Elaine Cannon, Marilyn Caldwell, and his ex-wife, Eileen Evertson, were not working interest participants in the first well.

Exhibit 9 is an assignment by the defendant and his wife to the plaintiff, Dale Cannon, and Melvin Brunet of interests in the first well. The plaintiff testified that he had contacted the state to obtain a new field designation for the whole Gulf farmout and additional acreage of the East Matador unit, which was granted. The letter from the state was directed to the plaintiff and the defendant. The plaintiff later testified that only the first well had been drilled when the state granted the designation, and the limits of the new field were not designated.

On cross-examination the plaintiff testified that his offer to pay the expenses on the additional wells was contained in the following language of the letter from his attorney to the defendant:

1. Mr. Evertson considers himself to be a partner (30% working interest owner) in the entire lease described herein, and any adjoining acreage acquired by you or in your behalf;

2. In the event that any additional drilling or exploration is performed on any of the leased acreage, or adjoining acreage, by you or on your behalf, Mr. Evertson will be a partner as stated above (whether it be a producing well or a dry hole) . . . .

According to the plaintiff, the offer to pay was implied by the use of the term "30% working interest." The plaintiff testified that he fired the defendant only once, in June 1983. He also testified that both men had occasionally used company

facilities to make private deals. The plaintiff testified there were some problems between him and the defendant when his divorce was filed on January 12, 1982. He then testified the Gulf farmout lease was requested in the summer of 1982, the leases on Sections 10 and 15 were acquired in June 1983, and the Juelfs lease was acquired in September 1983. The plaintiff also testified that the allegation in his pleadings that at the time all of the leases were acquired there was a relationship of trust and loyalty was not true, at least as to the Juelfs lease.

The plaintiff also testified that Evertson Well Service was listed as the operator of the first well because it had the bond required by Nebraska law, and, at that time, the defendant did not. The plaintiff stated that later that year, when the defendant obtained a bond, he then became the operator.

When asked whether, if the defendant had never offered him an interest in the first well, he would have felt "gypped, robbed, or [that the defendant had] violated his trust," the plaintiff answered, "No."

The plaintiff admitted that in a deposition taken prior to the divorce settlement he made a statement that he was supposed to have a 30-percent interest in the first well. The plaintiff also admitted that he had assigned a 15-percent interest in the first well to his former wife as a part of the property settlement and had represented that amount as half of his interest. Plaintiff also stated he had signed a division order from the Permian Corporation which stated that he owned a 15-percent working interest. He later testified that at the time his deposition was taken in his divorce case, June 9, 1983,

> it was pretty evident on that day that Rob had been working with Jeannie for quite some time.
>
> Q. What do you mean by working with Jeannie?
>
> A. Well, I think Jeannie stated in there that I tried to sell the companies out from under Rob, or something to that effect, and that just wasn't true.
>
> Q. Were you convinced at that time, on June 9, 1983, at the time of the taking of your deposition, that Rob was working against you?
>
> A. It sure looked like it to me.

Under the terms of the property settlement the corporations

were divided between the two men and Mrs. Evertson.

On redirect plaintiff was asked about his statement that had the defendant not offered him an interest in the first well, plaintiff would not have felt gypped or cheated. The plaintiff explained that statement by stating his feelings would depend upon the stage of the proceedings, in that once he paid his portion of the expenses on a drill-to-earn farmout arrangement, he would feel cheated if denied the opportunity to participate in the whole farmout.

The plaintiff then called the defendant, who testified the two men had had an extremely close relationship for many years. The defendant testified the first well was drilled on the initial 40-acre tract leased from Gulf, and, because that well was successful, 200 additional acres were earned. A second well was drilled on the additional (or farmout) acreage, known as Cannon-State No. 1, which became a producer. The defendant testified he was unaware plaintiff claimed an interest in the well until he received a letter from plaintiff's attorney. The defendant testified he assigned interests in that well to his wife, Elaine, Dale Cannon, Arlene Meredith, Jeannie Evertson, and Melvin Brunet. The defendant testified he believed the two men were partners on the first well only and that he had never stated he was giving the plaintiff an interest in the entire Gulf farmout.

The plaintiff next called the geologist used on the project, Alexander Boardman. Boardman testified his first business relationship with the two men occurred during the drilling of the first well. Boardman testified the defendant initially contacted him about the project in about July 1982. He then investigated the possibilities and advised the defendant where to drill. Boardman testified he had not spoken with plaintiff during this time.

Boardman testified he later told both men that to maximize their position the best acreage to obtain would be the southeast quarter of Section 9, the west half of Section 10 or any part of 10, and the northwest half of Section 15. His next proposed location was the northeast quarter of the northeast quarter of Section 16. Boardman defined an "area of mutual interest" as an area where two or more individuals have a mutual interest to acquire assets, jointly, as quickly as possible. Boardman

testified that, in his opinion, the acreage he recommended the two men acquire was an area of mutual interest. Boardman testified he had then asked the two men for an overriding interest because he had recommended the additional acreage and asked for the royalty in the new leases rather than the Gulf farmout acres, and the two men agreed. Boardman testified he was receiving an override royalty on the Coop lease at the time of trial. Boardman testified that he gave all of his information concerning the well and recommendations concerning the acquisition of additional acres to both men. Boardman believed, based on his experience in the industry, that the two men were joint operators.

Boardman testified he was unaware of any problem between the two men until the fall of 1983, when Dale Cannon contacted him about drilling on Section 16 and informed him the well would not be called the Willson-State No. 2. Boardman testified he subsequently set the Juelfs No. 2 well for Dale Cannon on Section 15, State No. 1 on the northeast quarter of the northeast quarter of Section 16, and Coop No. 1 on Section 10.

Boardman testified there are customs and practices in the industry concerning informal and oral agreements, that verbal agreements are very often used because of time constraints, and that it was customary in situations involving more than one person for one to act as the operator, do the correspondence and negotiations, and later assign interests when the well produces. Boardman testified there are customs and normal practices in the industry concerning the participation of the working interest owner in the first well and his subsequent participation in wells located within the area of mutual interest. He testified it was customary, in this area, depending on one's interest in the first well, to participate in all subsequent wells on that lease or farmout plus any additional acreage acquired on adjoining lands. Boardman also testified such a practice was more economical because it limits competition and therefore "the partnership that goes with the first well, continues throughout, assuming each partner pays their own way and does not renege."

On cross-examination Boardman testified that an

individual's entitlement to an interest in subsequent wells after the first well is drilled depends upon what interests the parties agreed to share, either in writing or orally, when the first well was drilled. Boardman did not know what agreement the parties had concerning the interests in the first well.

Boardman testified that, all things considered, he would pay considerably more for a working interest in the Cannon-State well than for such an interest in the Willson-State.

The plaintiff then called Daniel Matthews, a former accountant of Evertson Well Service. Matthews testified he did the plaintiff's personal books and tax returns, and tax returns for defendant for 1 year. He was supervised by both men but worked more closely for the plaintiff. He considered himself a close friend of the defendant's until February or March 1983, when he was told defendant considered him "crooked." Matthews testified that from 1977 through 1983 the plaintiff and defendant were like brothers. Matthews testified he had listened to the property settlement discussions wherein it was discussed that the two men could no longer work together and have a working relationship and, therefore, they wanted to split up the corporations. He stated the Gulf farmout agreement and the first well were discussed at both meetings. Matthews also testified he had once heard defendant tell plaintiff that he was planning to do something on the Willson Ranches and that plaintiff indicated he would be interested.

Matthews further testified that he had asked the defendant whether a drilling permit had been filed on the first well, and when defendant indicated he had not done so, the latter asked if Matthews could do so. Matthews then asked the defendant whether he had an operator's bond, and when the latter said no, Matthews told him Evertson Well Service did have a bond and he could fill out the drill permit with Evertson Well Service as the operator. Matthews testified he had spoken with Tommy Lee about the acreage both men wanted to be checked. Matthews testified Tommy Lee returned the next evening and told the two men about the owners on the various sections. Matthews testified that he and the defendant had reviewed the bills from the wells and summarized them for the working owners on December 28, 1982. Matthews testified that when

plaintiff paid the first bill representing his interest in the first well, the invoice which set out plaintiff's working interest percentage was not submitted to plaintiff along with the check. Matthews testified that at that time he did not know what percentages the two men had agreed upon. Matthews testified he became aware of the problem in January or February of 1983 after plaintiff saw one of the invoices and called Matthews to ask him about it.

Matthews testified he was unaware that Dale Cannon was involved in the first well until December 28, 1982, when the defendant told him the distribution of interests. Matthews testified the two men had previously drilled wells together without first entering into written agreements.

The next witness was Stanley Pierson, an earth-moving contractor who worked on the first well. Pierson had been contacted by plaintiff. On cross-examination, Pierson testified he had discussed the well with Dale Cannon at some time during the drilling of the first well and dealt with Dale Cannon on the wells subsequently drilled.

Plaintiff's next witness was Ebb Lueck, who testified he had a conversation with the two men wherein the two were discussing the possibility of acquiring more acreage and had asked Lueck to contact his landman for them. Lueck testified it was customary in the industry for parties to enter into informal and oral agreements, and written agreements are not entered into until the parties have committed to the deal. Lueck testified that in situations where people invest in a first well, they generally own their proportionate share of additional acreage.

On cross-examination Lueck testified that when giving his opinions as to the customs of the industry he was relying on his experiences, which involved mostly promoted deals. A promoted deal is a deal in which a promoter finds a drilling prospect and all of the people who buy into the deal pay their share of the costs. Lueck testified he did not have any understanding of the terms of the deal between the parties in this case. He also testified that, in a promoted deal, the initial well is drilled with the participants' money, and they would have agreed in advance as to the scope of the agreement as to the mutual area of interest, meaning they would have agreed in

advance to participate on subsequent wells. Prior to drilling, in deals he organizes, Lueck puts the agreement and operating agreements in writing, and such agreements contain the right to participate in additional wells.

Tommy Lee then testified for the plaintiff. Lee testified he had met with Dan Matthews on December 7, 1982, and was told to check out Sections 9, 10, 15, and 16, in Morrill County. He returned to Evertson Well Service later that evening and gave the information he had obtained to both men. When the three men met again the next night, Lee gave specific suggestions concerning the acquisition of the leases. It was his understanding that the three then agreed upon a plan of action. Lee testified the plans were never realized, he later billed Evertson Well Service for his services, and he did not receive his compensation until sometime within 6 months prior to trial. It was his impression the two men were partners, although he did not know the specifics of their relationship. Lee testified he had often taken leases in his own name and later assigned them pursuant to oral agreements. He also testified that a person involved in the first venture, who spent his money on the front end, should earn the same opportunity in subsequent lands involved. He testified that such a practice was common in the industry and would apply to a farmout situation, in that once the initial well was completed, the normal procedure would be to go back to the people involved in the first well.

The plaintiff's next witness was Paul Roberts, a petroleum engineer employed by the Nebraska Oil and Gas Conservation Commission. Roberts testified he was aware of the customs and acceptable practices in the industry in the area of western Nebraska and eastern Wyoming. He testified that in a situation where working owners participate in the first well in the area, those same people normally participate in subsequent wells. On redirect examination, Roberts testified that if he was a working interest owner in the first well on a 200-acre farmout and was not assigned or offered a chance to participate in other wells, he would feel he had been treated unfairly. On recross-examination Roberts testified his entitlement to the additional acres would depend upon the agreements between the participants.

The next witness called was Craig Camozzi, who testified that he had asked the two men about the structure of their deal and what kind of acreage could be earned by drilling. The defendant answered that "they got a 200 acre farmout from Gulf Oil." Camozzi presumed the word "they" referred to both men. Both men indicated there could be additional drilling north of the well, as an offset. Camozzi testified that, on one occasion, both men said they were partners in the well, and that people who participate in the first well in a project usually participate in subsequent wells, but such participation is normally subject to an agreement between the parties.

The next witness was Simmons Cook, who testified the defendant had asked him to set up a meeting for him with Frank Baumgartner. Cook later attended the meeting, along with the two men and Tommy Lee. Cook testified he had previously been part of a deal with Dale Cannon wherein one producing well was drilled which earned additional acres. No additional wells had been drilled, but Cook received an assignment of interests in the entire acreage.

The plaintiff next called Leon Birdwell, who was then employed as a superintendent for Evertson Well Service. Birdwell examined the terrain upon which the first well was located, prior to its drilling. On cross-examination Birdwell testified Dale Cannon's equipment was used to remove snow at the first well.

Randy Nielsen, the plaintiff's former attorney, was then called by plaintiff, and the parties stipulated he was authorized to testify and that any confidential privilege was waived. Nielsen had been asked by both men to review a letter from Gulf concerning the farmout and advise them of its legal ramifications. Nielsen advised the defendant at that time that he was representing the plaintiff in the divorce proceeding between the plaintiff and the defendant's sister. The defendant had stated there was no problem and that he wanted to stay out of the divorce. There was also a discussion about and a request that Nielsen do some title work for the two men. Nielsen testified that Dale Cannon brought some papers from Gulf to his office for additional work. Nielsen subsequently prepared an assignment and forwarded it to the defendant, and then a

second copy mailed on April 8, 1983. Nielsen received the second copy of the assignment back approximately 3 months later, after several delays because the defendant's wife had been out of town. He thought the original document might have been destroyed.

Nielsen became aware of a dispute between the parties when he received a letter concerning the assignment, which assigned only an interest in the original 40 acres, the first well, to the plaintiff. Nielsen subsequently prepared a letter addressed to Thomas Brower, the defendant's attorney, concerning the lease and operating agreement, stating both were unacceptable to the plaintiff.

The letter stated the operating agreement was unacceptable because it did not cover all of the land contained in the farmout lease. The letter was dated August 25, 1983. Brower responded to this letter by requesting Nielsen return the original signed copies of the operating agreement and a copy of any document evidencing an agreement between the parties.

On cross-examination Nielsen testified that no one had told him the entire 200-acre tract was part of the deal between the two men, but he had assumed that it was. He was unaware the plaintiff had claimed more than a 30-percent interest in the first well until the lawsuit was filed. Nielsen further testified that Dale Cannon had given him papers, including a note which indicated the various interest holders. The note was taken at some point by the plaintiff and was not produced at trial. Nielsen testified he filed the assignment as written by the defendant so that the plaintiff could receive his money.

The plaintiff then called Roland Champion as an expert witness. He had reviewed the depositions, talked with the plaintiff, and met with the plaintiff's counsel to review the case, and believed that he was familiar with it. Champion stated he understood the defendant's theory of the case, and was familiar with farmout agreements in general and with the area in question. He testified he had never seen an operator limit the interest of a working owner to the area of the first well. Champion testified such a right of participation could be inferred from ownership, and was practical, because it is viewed as a joint venture wherein everyone shares equally losses and

profits, and it prevents competition.

On cross-examination, Champion testified it was the present custom in the industry to reduce agreements to writing. He also testified that the scope of any venture, including the number of acres and wells, depends upon the agreement between the parties.

The next witness was Norman Adams, a consulting petroleum engineer, called as an expert witness. Adams had evaluated the East Matador and filed reserves upon the request of Lueck, who acted on instructions from the plaintiff. The growth reserves for the first well were 102,000 barrels. He also testified as to potential prices and drainage concerns.

Plaintiff then called Jerry Simmons, who testified that a "40 acre deal" was a situation where only 40 acres are involved in a farmout arrangement. He had never seen such an agreement in the D-J basin.

On cross-examination, Simmons testified that an area of mutual interest was generally determined by agreement of the parties, which, in his experience, was generally a written agreement. He testified that an individual's right to participate in wells drilled after the first well was dependent upon the agreement of the parties.

On redirect examination, Simmons stated that it was his practice to give participants who invest in the first well an opportunity to participate in all additional drilling on the same basis as the first one. Such a practice eliminates competition among the participants. He further testified that generally he first enters into an oral agreement in oil deals, which may not be committed to writing for some time.

On recross-examination, Simmons testified such oral agreements are generally reduced to writing before the well is drilled, and such agreements generally include any rights to participate in later wells. On redirect examination, Simmons testified it was not uncommon to drill on an oral agreement, particularly in yearend deals.

The plaintiff then called Dale Cannon, who testified that he acquired an interest in the first well in 1983, after the well was drilled, but he had an agreement to acquire that interest in 1982. He testified he was a working interest owner in the Cannon-

State No. 1 well, had acquired that interest in 1983, and had a working interest in the Coop No. 1 well, which had been acquired in 1984.

The plaintiff then rested.

The defendant moved for a directed verdict on the grounds the plaintiff had failed to prove, by clear and convincing evidence, that there was an agreement as alleged in the petition which had been violated by the defendants. The remaining defendants also moved for a directed verdict on the grounds the agreement involved an interest in real estate, and therefore had to be in writing to satisfy the statute of frauds and that the plaintiff had presented no evidence of any relationship between himself and these defendants upon which to base a constructive trust. The court took the motion under advisement and directed the defendants to proceed.

The defendants first called Dale Cannon, who testified he and the defendant had begun to discuss a joint drilling project in the spring of 1982. The two later investigated prospective drilling sites and decided to check out land titles on property adjacent to the Exeter well. Dale then recommended the defendant call Alex Boardman for advice. Dale testified the defendant handled all of the negotiations but kept him advised of his progress. Dale stated that he and the defendant discussed the Gulf deal together before deciding to take it. It was his understanding, at that point, that he, the defendant, and Melvin (Coonie) Brunet would be the only participants in the deal. Dale stated he was unaware plaintiff would have an interest in the well until shortly before a drilling rig had moved onto the site. At that time he understood the plaintiff would have only a 15-percent interest in the first well. Dale stated that although he was not involved in the day-to-day drilling activities of the first well because he was involved in drilling three other wells in Kansas, he had made arrangements for Powers Elevation to stake the well. Dale testified he and the defendant discussed the acidizing and fracing of the well, and he loaned the defendant a tank of crude oil for use in acidizing the well.

Dale testified that in January 1983 he advised his son not to assign any interests out and to make sure the oil purchasers sent

their payments before he paid any money out. He stated that at that time they also discussed the size of the acreages. He testified they agreed they should let other people in on 40-acre locations,

> because— We had discussed the possibility of this being a dry hole— And Rob said, "I'm going over right away and drill another one then and I'll try to find it; at least one more, maybe two."
>
> Evidently, he had told me that he had discussed this with Evertson; he told Evertson the same story, and Evertson said well, "That's kind of stupid. I wouldn't go drill two more dry holes." Rob said, "No, it's not stupid, to my way of thinking, because I know that it's there. It's just a matter of finding it."
>
> Well, that shows right there that anybody interested in that first well could have backed out on the next well or two and, therefore, you've got the lease tied up because they don't want to put their money in. So, you know, it's better to assign it, on this type of a deal, to 40 acres where we knew that we were going to drill at least two or three wells if the first one was dry.

Dale testified he would have invested in a second well if the first one had been dry. Dale testified that he and the defendant worked together on the second well. Dale paid for the drilling and completion of the well and was repaid by Arlene Meredith, the defendant, and Jeannie Evertson in exchange for interests in the well. Dale had previously paid the defendant for his interest in the first well.

Dale testified that he paid for the "wash-down" of Juelfs No. 1 and was later repaid by Eileen Evertson and the defendant. The next well was Juelfs No. 2, which was ultimately abandoned, and the same payment arrangements were made.

The next well drilled was the Coop No. 1 well, which was a producer. Similar payment arrangements were made on this well. On cross-examination Dale testified he had taken some action to increase the productivity of the Willson-State No. 1 well, after which production rose from about 32 barrels per day to 75 to 80 barrels per day.

Dale testified that he and the defendant did not have any written agreement concerning their interests in the first well. He believed Brunet knew it was a 40-acre deal and that Brunet had an interest in the first well and the Cannon-State No. 1 and Coop No. 1 wells. He also testified that he did not trust the plaintiff. ·

The defendant testified that the plaintiff had asked to participate in the Gulf deal just after the defendant had struck a deal with Gulf. The defendant testified he had told plaintiff at that time,

it was just a one shot deal. You know, if it made a dry hole, I was going to step off and drill another one directly right by it. He said, "Well, he didn't have no problem with that because it was kind of stupid to drill two dry holes in the same place anyway."

The defendant testified that plaintiff clearly stated he wanted either 15 or 20 percent, because that was the figure needed for yearend tax purposes. The defendant did not tell the plaintiff they would be equal partners in the first well, and he told the plaintiff that his dad would be involved. The defendant testified the two men disagreed as to which drilling contractor to use, and defendant made the ultimate decision himself. The plaintiff lined up some contractors, while the defendant lined up others.

The defendant testified he decided upon the percentages to assign to the participants in December, and gave the plaintiff a greater interest than he had requested to repay him for past dealings and because the plaintiff's marriage seemed on firmer ground. At this time the defendant knew the first well was a good one. The defendant testified that after he was fired by the plaintiff for the first time on February 20, 1983, he decided not to offer the plaintiff interests in any wells subsequent to the first well.

Melvin Brunet testified that when he learned Gulf had given the defendant an offer which he planned to accept, Brunet told him he was still interested and would probably take a one thirty-sixth interest. He later discovered the defendant had let the plaintiff in on the deal, which surprised him. Brunet testified the defendant told him the defendant would have the

controlling interest in the well and operate it. Brunet said it was his understanding that the deal involved only the 40 acres upon which the first well was located, and everyone would be in on the same deal with regard to the first well. The parties later agreed that Brunet would have a 3.13-percent interest. Brunet testified he has working interests in the Cannon-State and Coop leases and obtained those interests prior to the drilling of the wells. The defendant had told him each well was a separate deal. Brunet testified he was offered an opportunity to participate on the first Juelfs well but declined to do so, and was not offered an opportunity to participate in the second Juelfs well. Brunet testified he received no correspondence concerning the first well, but received written correspondence concerning the subsequent wells prior to drilling.

Brunet testified that he did not believe, at any time, that he had any right or entitlement to an interest in acreage or well sites other than those offered to him by the defendant.

On cross-examination Brunet testified he had never discussed the agreement between the parties with plaintiff. In a deposition Brunet had stated that his interest was initially limited to the 40-acre tract.

Arlene Meredith testified she had worked for the defendant since 1980, first for Evertson Well Service, then for Cannon Oil Well Service. She testified her sister, plaintiff's former wife, had told her that the plaintiff had said the Gulf farmout deal was not his deal and had later stated he would take 10 to 15 percent of it. She testified the defendant told her that he had let the plaintiff in on the deal to repay him for letting the defendant in on deals in the past. He also told her plaintiff's participation was limited to the 40 acres.

Eileen Cannon, the defendant's mother, testified that the defendant had told her the plaintiff had a 15- to 20-percent interest in the first well only.

A constructive trust may be imposed where "one has acquired legal title to property under such circumstances that he or she may not in good conscience retain the beneficial interest in the property." *Ford v. Jordan*, 220 Neb. 492, 494, 370 N.W.2d 714, 716 (1985). In such a case, equity will convert the legal titleholder into a trustee holding the title for the benefit of

those entitled to ownership. Such a suit is reviewed by this court de novo on the record, "giving consideration, where the evidence is in conflict, to the fact that the trial court observed the witnesses and their manner of testifying and accepted one version of the facts rather than the opposite." *Id.*

A joint venture arises when

> "there [is] an agreement to enter into an undertaking in the objects of which the parties have a community of interest and a common purpose in performance, and each of the parties must have equal voice in the manner of its performance and control of the agencies used therein, though one may entrust performance to the other."

*Fangmeyer v. Reinwald*, 200 Neb. 120, 131, 263 N.W.2d 428, 434 (1978), citing and quoting from *Soulek v. City of Omaha*, 140 Neb. 151, 299 N.W. 368 (1941).

> The relationship of joint venturers depends largely upon the intent of the alleged parties as manifested from the facts and circumstances involved in each particular case. The mere pooling of property, money, assets, skill, or knowledge does not create the relationship; there must be something more than mere sharing of profits, some active participation in the enterprise, and some control of the subject matter thereof or property engaged therein. "Each member of a joint adventure has a dual status — that of principal for himself, and as an agent for the others."

*Fangmeyer, supra* at 131, 263 N.W.2d at 434.

In *Soulek* we stated a joint venture can exist only by voluntary agreement of the parties, and cannot arise by operation of law. We also stated that the agreement need not be express, but may be implied, in whole or in part, from the apparent purposes and the acts and conduct of the parties. The relationship depends upon the legal intent of the parties as determined by examining the facts and circumstances of each case. The primary criterion is that the parties enter into an agreement, express or implied, as owners or principals in the endeavor. The arrangement must be for the parties' mutual benefit, "in the pursuit of which each has equal voice, control and authority, although performance may be entrusted to one. There must be a community of interest in the objects and

purposes of the enterprise, without which there can be no joint adventure." *Soulek, supra* at 156-57, 299 N.W. at 372.

The existence of a joint venture is a question of fact. *Rossbach v. Bilby*, 155 Neb. 575, 52 N.W.2d 747 (1952). Once a joint venture is created, each party has a right to expect the utmost good faith and square dealing in all matters which relate to the common interest, because the venturers stand in a fiduciary relationship to each other. *Alexander v. Turner*, 139 Neb. 364, 297 N.W. 589 (1941).

The U.S. Court of Appeals for the Eighth Circuit applied Nebraska law in *Kelley Inv. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 386 F.2d 595 (8th Cir. 1967), to determine whether a joint venture was created by an oral agreement. After summarizing Nebraska law, the court concluded that an oral agreement in which money contributed by one party was combined with the skill and knowledge of the other, in a common enterprise of speculating in the stock market for their mutual benefit, had created a joint venture. The parties had agreed to share profits and losses, and, although one party had been entrusted with performance, the court found there was mutuality of control. The latter finding was based on the party's admissions and the agreement that either party could liquidate the contracts.

This court addressed the issue of the existence of a joint venture in *Carey v. Humphries*, 171 Neb. 578, 107 N.W.2d 20 (1961). In *Carey*, we held:

> "The existence of a joint adventure is a question of fact under the evidence, and further, more convincing evidence is required to prove existence of a joint adventure where alleged joint adventure parties are the only litigants than where the controversy is between a third party and the joint adventurers. The burden of establishing the joint adventure is on the plaintiff."

*Id*. at 596, 107 N.W.2d at 31.

In *Carey* the facts established that defendant Dan Reinfried had acted as a principal in the transaction, and not as an agent or representative of anyone else. Reinfried acted only on his own behalf in securing the leases and dry-hole money and in selling them to Robert Braden. To establish a joint venture the

proponent must show its existence by clear and convincing evidence. On those facts we held a joint venture was not created and Reinfried had not breached a fiduciary duty by entering into certain other leases without advising Braden, the person who had purchased the first leases.

The plaintiff argues there is a distinction between *Carey* and this case because in *Carey*, unlike here, the court found there was no venture. The plaintiff argues that *Carey* is also distinguishable because there, unlike here, the parties presented no evidence of custom in the industry.

This argument is unpersuasive. In *Carey* the court found there was no joint venture relationship because the transactions at issue were wholly separate and not subject to an agreement between the parties to act as joint venturers. The trial court made a similar finding in this case, that the transactions were separate and not subject to an agreement between the parties. The court specifically found that a fiduciary relationship in this case arose only as to the operation of the first well.

To establish the existence of a joint venture in this case plaintiff had the burden to prove, by clear and convincing evidence, the existence of an agreement between the parties in which the parties had a community of interest, common purpose in performance, and equal control. *Fangmeyer v. Reinwald*, 200 Neb. 120, 263 N.W.2d 428 (1978). Such an agreement can be either express or implied from the conduct of the parties.

The plaintiff initially alleged in his petition that he and the defendant had entered into an oral agreement whereby they agreed to act as joint venturers as to the entire project. The plaintiff contends such agreements are customary in the industry and are enforceable through the imposition of a constructive trust, notwithstanding the statute of frauds.

The evidence concerning the existence of such an agreement and its terms was conflicting, and resolution of the many conflicts rested in determinations of credibility. There were no witnesses who had personal knowledge of an oral agreement between the parties, no writings evidencing its terms, and inconsistent versions of events.

The plaintiff testified that it was his understanding that the

parties would be equal partners in the entire project; that he was involved in the preliminary investigations for a drilling site; that the defendant had agreed to handle the negotiations with Gulf; and that, for that reason, the farmout agreement named the defendant as the lessee. There was evidence the two men had explored the possibilities of acquiring additional acres with an independent landman and the geologist on the project. Although there was some evidence of custom in the industry, that evidence was not particularly helpful to the plaintiff because each witness conceded participation in such ventures is dependent upon the agreement of the parties. Further, the plaintiff stated, in various independent actions, that his interest was limited to a 30-percent interest in the Willson-State well.

The defendant's evidence completely contradicted the plaintiff's. The defendant testified he had never told plaintiff they would be equal partners in the project, but had offered him only a limited interest in the first well. Several of the other working owners testified they had been offered the deal on a similar basis. There also was evidence that the two men had frequently been involved in separate transactions in the past, in which the other party often was offered only limited participation.

It seems clear that the parties had some agreement that the plaintiff would participate in the project prior to the drilling of the first well. The evidence, when taken as a whole, indicates the agreement was that the plaintiff would have a percentage ownership in only the first well. The evidence tends to show that the defendant, like the defendant in *Carey v. Humphries*, 171 Neb. 578, 107 N.W.2d 20 (1961), entered into the agreement with Gulf as a principal representing only his own interests, rather than as an agent representing the plaintiff's interests as well. There is no evidence the parties had an agreement to jointly acquire leases generally. In fact, the evidence supports a contrary finding. The two men often acquired separate interests which they were free to share, or not.

The plaintiff's alternative argument, that the close relationship between them created an implied joint venture, is also nonpersuasive for several reasons. First, as noted above, the relationship was premised on the right of each person to

enter into separate deals without the obligation of including the other. Second, while the existence of a close business relationship may be a factor to be considered in determining whether a fiduciary relationship exists, it alone is not generally sufficient. For example, in *Tyra v. Woodson*, 495 S.W.2d 211 (Tex. 1973), the court held that the fact that one businessman trusts another and relies on his promise to perform a contract does not create a constructive trust. The court held the plaintiff had to prove the existence of a fiduciary relationship separate from the agreement forming the basis of the suit to overcome the effect of the statute of frauds.

In *Greenbaum v. Kirkpatrick*, 129 F. Supp. 648 (W.D. Okla. 1955), the plaintiff sought to impose a constructive trust over certain oil and gas leases obtained by the defendant on the grounds of an alleged joint venture based on an oral agreement. The plaintiff alleged the parties had agreed to be equal partners, in that the defendant would obtain leases, plaintiff would obtain investors, and ownership would be divided equally. The plaintiff alleged he contacted investors and defendant contacted landowners, but after the defendant had acquired the leases he repudiated their agreement and gave an interest to a third party. The plaintiff contended the latter lessees held their interests on a constructive trust for plaintiff. The court held that the plaintiff had failed to prove the existence of the alleged agreement by clear and convincing evidence and that the preliminary negotiations between the parties were held with a view toward a future course of conduct rather than a present binding contract wherein their minds had met.

In *Hoover v. Cooke*, 566 S.W.2d 19 (Tex. Civ. App. 1978), a geologist brought suit against another geologist to impose a constructive trust upon certain mineral interests. In examining the types of relationships which must be proven to recover on an alleged abuse of such a relationship, the court made several observations.

" 'A constructive trust is a relationship with respect to property, subjecting the person by whom the title to the property is held to an equitable duty to convey it to another, on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly

enriched if he were permitted to retain the property.' "
*Id*. at 26 (quoting *Talley v. Howsley*, 142 Tex. 81, 176 S.W.2d 158 (1943)). The court further stated a constructive trust does not arise from the existence of a confidential relationship, but only where such a relationship was violated by an abuse of confidence rendering the acquisition or retention of property by one party unconscionable. The court stated such a remedy is not available for every moral wrong, and mere subjective trust alone will not suffice; the fact that one businessman trusts another is not enough.

" 'The fact that people have had prior dealings with each other and that one party subjectively trusts the other does not establish a confidential relationship. . . .' " *Hoover v. Cooke, supra* at 27. The opinion reasoned that " ' "[b]usinessmen generally do trust one another, and their dealings are frequently characterized by cordiality . . . ." ' " *Id*.

The court also deemed important the fact that, as a general rule, in arm's-length transactions where both businessmen stand on equal footing in terms of "education, ability, experience and business acumen . . . each party must exercise due care for the protection of his own interests, and a failure to do so is not excused by mere subjective trust or confidence in the honesty and integrity of the other party." *Id*.

Fiduciary duties extend only to dealings within the scope of that relationship. *Fuqua v. Taylor*, 683 S.W.2d 735 (Tex. App. 1984). In *Fuqua* the parties had entered into a written agreement whereby the defendant, a geologist, was designated as an operator for the drilling project. He later acquired a lease on a well, which the venture had allowed to expire, without informing his co-venturers. He had also acquired leases on nearby property. The court found he had breached his fiduciary relationship as to the expired lease but not as to the new lease on nearby land, because the latter was not within the scope of his fiduciary duties.

The evidence in this case fails to show the breach of a fiduciary duty. The parties were businessmen with equal stature, education, and experience. Their prior dealings, apart from the Evertson Well Service companies, were characterized by individual, rather than joint, undertakings. The plaintiff

could have protected his perceived interest in the project at the beginning. His involvement in the farmout agreement was on a limited, rather than an equal, basis, and the plaintiff did not object to those terms in a timely fashion or exercise due diligence to support his claims. Moreover, the plaintiff's actions and admissions in separate proceedings are in direct contravention to his claims here.

The plaintiff's evidence falls short of being clear and convincing.

The judgment is affirmed.

AFFIRMED.