GLOBAL CREDIT SERVICES, INC., APPELLANT, v. AMISUB (SAINT
JOSEPH HOSPITAL), INC., ET AL., APPELLEES.

508 N.W.2d 836

Filed December 10, 1993.    No. S-91-759.

James H. Monahan for appellant.

Neil B. Danberg, Jr., and James L. Schneider, of Kennedy, Holland, DeLacy & Svoboda, for appellees AMISUB et al.

David A. Blagg and Terry J. Grennan, of Cassem, Tierney, Adams, Gotch & Douglas, and Gerald Friedrichsen, of Fitzgerald, Schorr, Barmettler & Brennan, for appellee Creighton University.

HASTINGS, C.J., BOSLAUGH, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

Plaintiff-appellant, Global Credit Services, Inc., asserts that the defendant-appellee AMISUB (Saint Joseph Hospital), Inc., the operator of Saint Joseph Hospital, breached its contract with Global and that the other defendants-appellees, and each of them, jointly and severally, tortiously interfered with and destroyed Global's business relationship with AMISUB. Global seeks an accounting and damages.

Four of the other defendants-appellees are corporate entities: American Medical International, Inc., Creighton Omaha Regional Health Care Corporation, Creighton University, and The Health Future Foundation. The remaining defendants, Judy Franksen, Leigh Jean Koinzan, and Thomas

Tokheim, are individuals working at the hospital, whose allegedly wrongful acts Global asserts are to be attributed to each of the corporate defendants.

All of the defendants moved for summary judgment of dismissal; the district court sustained the motions of all the corporate defendants except AMISUB and partially sustained the motions of the individual defendants. Global has appealed only the judgments of dismissal entered in favor of the four corporate defendants last named above.

Global's operative assignments of error claim, in summary, that the district court erred in failing to (1) pierce the veils of the four dismissed corporate defendants and hold that they all jointly operated the hospital and are each responsible for the actions of the other corporate defendants, or (2) find that the corporate defendants were joint venturers and, for that reason, each was responsible for the actions of the others. We affirm.

## II. SCOPE OF REVIEW

Proceedings seeking disregard of the corporate entity to impose liability on a shareholder for a corporation's debt or other obligation are equitable actions. An appeal of such a matter is tried de novo on the record, and the appellate court is required to reach factual findings independent of the trial court. *Southern Lumber & Coal v. M. P. Olson Real Est.*, 229 Neb. 249, 426 N.W.2d 504 (1988); *ServiceMaster Indus. v. J.R.L. Enterprises*, 223 Neb. 39, 388 N.W.2d 83 (1986). See, also, *Metropolitan Life Ins. Co. v. Kissinger Farms, ante* p. 620, 508 N.W.2d 568 (1993). In view of the rule that if a court of equity has properly acquired jurisdiction in a suit for equitable relief, it may make complete adjudication of all matters properly presented and involved in the case and grant relief, legal or equitable, as may be required and thus avoid unnecessary litigation, we need not concern ourselves with whether other aspects of this case sound in law rather than equity. See, *Trump, Inc. v. Sapp Bros. Ford Center, Inc.*, 210 Neb. 824, 317 N.W.2d 372 (1982); *Daugherty v. Ashton Feed and Grain Co., Inc.*, 208 Neb. 159, 303 N.W.2d 64 (1981); *Hull v. Bahensky*, 196 Neb. 648, 244 N.W.2d 293 (1976).

It must be borne in mind, however, that this matter arises on

the grant of summary judgments. Such a judgment is properly granted when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue concerning any material fact or the ultimate inferences that may be drawn from such fact or facts and the moving party is entitled to judgment as a matter of law. *VonSeggern v. Willman, ante* p. 565, 508 N.W.2d 261 (1993); *Gould v. Orr, ante* p. 163, 506 N.W.2d 349 (1993); *Design Data Corp. v. Maryland Cas. Co.*, 243 Neb. 945, 503 N.W.2d 552 (1993); *Metropolitan Life Ins. Co. v. Beaty*, 242 Neb. 169, 493 N.W.2d 627 (1993).

In appellate review of a summary judgment, the court views the evidence in a light most favorable to the party against whom judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Abdullah v. Gunter*, 242 Neb. 854, 497 N.W.2d 12 (1993); *Design Data Corp., supra*; *Abboud v. Michals*, 241 Neb. 747, 491 N.W.2d 34 (1992).

Moreover, as to questions of law, an appellate court has an obligation to reach independent, correct conclusions irrespective of the determinations made by the courts below. *AMISUB v. Board of Cty. Comrs. of Douglas Cty., ante* p. 657, 508 N.W.2d 827 (1993); *Metropolitan Life Ins. Co. v. Kissinger Farms, ante* p. 620, 508 N.W.2d 568 (1993); *Wilson v. Misko, ante* p. 526, 508 N.W.2d 238 (1993).

### III. BACKGROUND

On January 7, 1983, Global, doing business as Creditors Collection Bureau, signed a contract with Creighton Omaha Regional, then owner of Saint Joseph Hospital, for collection of its overdue patient accounts.

On November 19, 1984, Creighton Omaha Regional transferred the assets of the hospital to AMISUB pursuant to an August 24, 1984, agreement among Creighton Omaha Regional, American Medical, and AMISUB, American Medical's wholly owned subsidiary. AMISUB agreed to assume all of Creighton Omaha Regional's obligations, and with Global's consent, its collection agreement with Creighton Omaha Regional was assigned to AMISUB.

At the time of the transfer, Creighton Omaha Regional had several affiliation agreements, including one with the university, which was identified in the transfer as a third-party beneficiary entitled to enforce those provisions of the contract which obligated Creighton Omaha Regional and AMISUB to provide the university with specified benefits.

The August 24, 1984, agreement specifies that both American Medical and AMISUB will discharge certain specified obligations in connection with the operation of the hospital, with a "view toward establishing the HOSPITAL as [American Medical's] flagship and hub facility in the midwestern United States," and American Medical unconditionally guaranteed AMISUB's obligations. In addition, the agreement requires the university to participate in the long-range planning of the hospital and to designate university members to sit on the hospital's governing boards.

Also transferred was Creighton Omaha Regional's affiliation agreement with the university, requiring AMISUB and the university to maintain the hospital as a teaching facility, and under which the university was given control over all the health sciences taught at the hospital. It was agreed that the university would make recommendations concerning the selection of certain high-level administrative officers and be allowed to request that any director of pharmacy or nursing or any chief of clinical sections be removed if such person interferes with the teaching, research, and service functions of the university. AMISUB has similar rights with regard to the chairpersons of the clinical academic departments. In addition, there is a general provision declaring that the parties recognize and intend to preserve the separate existence of the two institutions and the independence of their financial resources and obligations.

The Health Future Foundation was established at about the time the hospital was transferred to support the university's mission and specifically its health sciences schools, which are described as an "integral part" of the medical center. The foundation, the university, and Creighton Omaha Regional share or have in the past shared common officers and directors.

On October 26, 1987, AMISUB terminated its contract with

Global, recalling and asking for the immediate return of all accounts which had been assigned to the latter and were then in its possession. In essence, Global claims the termination of its contract came about because the three individual defendants mischaracterized Global's handling of the accounts assigned to it for collection and made wrongful disclosures of that mischaracterization.

## IV. ANALYSIS

With that background, we turn our attention to Global's claims that the corporate defendants are either to have their protective veils as such entities pierced or to be treated as joint venturers.

### 1. CORPORATE VEILS

As a general rule, a corporation will be looked upon as a legal entity separate and apart from its shareholders and officers unless and until sufficient reason to the contrary appears, but when the notion of a legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons. *Southern Lumber & Coal v. M. P. Olson Real Est.*, 229 Neb. 249, 426 N.W.2d 504 (1988); *J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 391 N.W.2d 110 (1986); *ServiceMaster Indus. v. J.R.L. Enterprises*, 223 Neb. 39, 388 N.W.2d 83 (1986); *Scribner Grain & Lumber Co. v. Wortman*, 204 Neb. 92, 281 N.W.2d 394 (1979). The corporate identity is disregarded only where the corporation has been used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another. *J. L. Brock Bldrs., Inc., supra*; *Slusarski v. American Confinement Sys.*, 218 Neb. 576, 357 N.W.2d 450 (1984); *George v. Board of Education*, 210 Neb. 127, 313 N.W.2d 259 (1981). A plaintiff seeking to pierce the corporate veil must allege and prove that the corporation was under the actual control of the shareholder and that the shareholder exercised such control to commit a fraud or other wrong in contravention of the plaintiff's rights. See, *Krivo Industrial Sup. Co. v. National Distill. & Chem. Corp.*, 483 F.2d 1098 (5th Cir. 1973), *reh'g denied* 490 F.2d 916 (5th Cir. 1974); *Berger v. Columbia Broadcasting System, Inc.*,

453 F.2d 991 (5th Cir. 1972), *cert. denied* 409 U.S. 848, 93 S. Ct. 54, 34 L. Ed. 2d 89; *Gatecliff v. Great Republic Life Ins.*, 170 Ariz. 34, 821 P.2d 725 (1991); *Vuitch v. Furr*, 482 A.2d 811 (D.C. 1984).

Among the factors relevant in determining whether to disregard the corporate entity are grossly inadequate capitalization, insolvency of the debtor corporation at the time the debt is incurred, diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses, that the corporation is a mere facade for the personal dealings of the shareholder, and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity. *United States Nat. Bank of Omaha v. Rupe*, 207 Neb. 131, 296 N.W.2d 474 (1980).

Global argues that AMISUB is American Medical's alter ego because the former is a wholly owned subsidiary of the latter, and cites to various agreements between AMISUB and American Medical and the commonality of some of their officers and directors, alleging that "the operations of [AMISUB and American Medical] overlap, so that it is impossible to tell what business of AMISUB . . . is separate from business of American Medical." However, the doctrine of separate corporate existence does not break down merely because a corporation is a subsidiary, even if wholly owned by the parent. *SFN Shareholders v. Dept. of State Rev.*, 603 N.E.2d 194 (Ind. 1992); *Peoples Energy Corp. v. Ill. Commerce Com.*, 142 Ill. App. 3d 917, 492 N.E.2d 551 (1986). Nor is ownership of all the stock of the corporation by one person, in and of itself, a sufficient basis upon which to disregard the corporate form of AMISUB. See, *Krivo Industrial Sup. Co., supra*; *Volkswagenwerk, A. G. v. Klippan, GmbH*, 611 P.2d 498 (Alaska 1980), *cert. denied* 449 U.S. 974, 101 S. Ct. 385, 66 L. Ed. 2d 236; *Inst. of Veterinary Pathology v. Cal. Health*, 116 Cal. App. 3d 111, 172 Cal. Rptr. 74 (1981); *Amfac Foods v. Int'l Systems*, 294 Or. 94, 654 P.2d 1092 (1982); *Wakeman v. Paulson*, 257 Or. 542, 480 P.2d 434 (1971).

To pierce the corporate veil between a parent and a subsidiary, a plaintiff must show more than the mere sharing of services between the two corporations. In *Boafo v. Hosp.*

*Corp. of America*, 177 Ga. App. 75, 338 S.E.2d 477 (1985), a patient who allegedly suffered a severe injury while being administered anesthesia at a facility operated by the subsidiary brought an action against the parent corporation, alleging that the facility was run, operated, and managed by the parent corporation and the subsidiary. The *Boafo* court refused to pierce the corporate veil despite the fact that the corporations shared some officers and had jointly purchased the hospital property from bankruptcy receivership, the fact that some officers of the subsidiary were paid by the parent, and the existence of other facts showing a commonality between them. What was significant to the court was that the subsidiary was a fully capitalized and insured entity which owned the hospital property, autonomously managed and operated the hospital on a day-to-day basis, maintained its own payrolls, and employed its own employees.

For Global to pierce the corporate veil of AMISUB, it must show that American Medical totally dominated AMISUB to such extent that AMISUB had no separate corporate existence and functioned solely to achieve the purposes of the dominant corporation. See, *J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 391 N.W.2d 110 (1986); *Krivo Industrial Sup. Co., supra*; *Scott v. AZL Resources, Inc.*, 107 N.M. 118, 753 P.2d 897 (1988); *Unijax, Inc. v. Factory Insurance Association*, 328 So. 2d 448 (Fla. App. 1976), *cert. denied* 341 So. 2d 1086. Without more, the fact that AMISUB is a subsidiary of American Medical fails to establish that American Medical controls AMISUB.

Nor does American Medical's unconditional guarantee of AMISUB's performance in the transfer of the hospital extend its liability beyond the strict terms of that contract to make AMISUB an alter ego of American Medical. See *Federal Deposit Ins. Corp. v. Heyne*, 227 Neb. 291, 417 N.W.2d 162 (1987). Standing behind another's debts does not require that the corporate forms of the organizations be disregarded. *Krivo Industrial Sup. Co., supra*. See, also, *Frazier v. Bryan Memorial Hosp. Authority*, 775 P.2d 281 (Okla. 1989); *Amfac Foods, supra*.

Global asserts that the inadequate capitalization of

AMISUB requires the piercing of its corporate veil. The claim is based on the fact that at the time of its incorporation, issuance of 1,000 shares of capital stock at the par value of $1 was authorized. Inadequate capitalization means capitalization very small in relation to the nature of the business of the corporation and the risks the business entails measured at the time of formation. *J-R Grain Co. v. FAC, Inc.*, 627 F.2d 129 (8th Cir. 1980); *Southern Lumber & Coal v. M. P. Olson Real Est.*, 229 Neb. 249, 426 N.W.2d 504 (1988); *J. L. Brock Bldrs., Inc., supra.*

The authorization to issue capital stock in AMISUB's charter should not be confused with formal minimum paid-in capital requirements and, more importantly, does not reflect the ability of AMISUB to conduct its business. See, *J-R Grain Co., supra*; 11 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 5124 (rev. perm. ed. 1986).

However, even assuming without deciding that AMISUB is inadequately capitalized, it is only one factor to be considered in determining whether to disregard its corporate nature. See, *J. L. Brock Bldrs., Inc., supra*; *Scott, supra.* Under all the circumstances, that factor falls far short of providing grounds to ignore AMISUB's corporate form.

Global also claims that Creighton Omaha Regional and the foundation are wholly owned and controlled alter egos of the university. In so doing, Global points to the articles of incorporation of Creighton Omaha Regional, the foundation, and the university, which reflect that the three corporations share, or have shared in the past, common officers and directors. Indeed, one of the incorporators and directors of the foundation had served as the university's president. Hence, Global argues that the existence of common officers and directors provides a financial interest in Creighton Omaha Regional and the university by "direction and participation."

As uniformly held, the existence of interlocking directors is not, in and of itself, sufficient without direct evidence of specific manipulative conduct to warrant the piercing of the corporate veil. *Jabczenski v. Southern Pac. Memorial Hospitals*, 119 Ariz. 15, 579 P.2d 53 (1978); *Inst. of Veterinary Pathology v. Cal. Health*, 116 Cal. App. 3d 111, 172 Cal. Rptr.

74 (1981); *Unijax, Inc., supra*; *Pederson v. Paragon Pool Enterprises*, 214 Ill. App. 3d 815, 574 N.E.2d 165 (1991). Merely taking an active part in the management of a corporation does not automatically constitute control sufficient to pierce the corporate veil. In *Chicago Mill & Lumber Co. v. Boatmen's Bank*, 234 F. 41 (8th Cir. 1916), a bank had its assistant cashier elected president of the company to protect its investment of money to a mill and land company. In refusing to pierce the corporate veil, the court stated that the creditor's oversight of the operations of a debtor business did not warrant a finding that the bank was carrying on the business of the debtor as a part of the bank's business.

The uncontradicted evidence is that both the foundation and Creighton Omaha Regional are separate and distinct corporations from all the other defendants. The foundation is not a subsidiary of any corporation, maintains its own separate corporate and financial records, and conducts its own business and meetings. In short, there is no evidence that any corporation has such a financial interest in, or total domination over, the other as to permit the corporate existence of any corporation to be ignored.

### 2. JOINT VENTURES

Global also claims that all five corporate defendants are liable for the actions of the individual defendants because they engaged in a joint operation of the hospital.

A joint venture can exist only by voluntary agreement of the parties and cannot arise by operation of law. *Evertson v. Cannon*, 226 Neb. 370, 411 N.W.2d 612 (1987). There must be an agreement to enter into an undertaking; the parties must have a community of interest in the object of the undertaking and a common purpose in performance; each of the parties must have an equal voice in the manner of performance and control over the agencies used. *Fangmeyer v. Reinwald*, 200 Neb. 120, 263 N.W.2d 428 (1978). The mere pooling of property, money, assets, skill, or knowledge does not create the relationship. *Id*. And there must be something more than mere sharing of profits; there must be some active participation in the enterprise and some control of the subject matter thereof or

property engaged therein. *Id.* See, also, *Strother v. Herold*, 230 Neb. 801, 433 N.W.2d 535 (1989); *Evertson, supra.* The absence of mutual interest in the profits or benefits is conclusive that a partnership or joint venture does not exist. *Frisch v. Svoboda*, 182 Neb. 825, 157 N.W.2d 774 (1968). See *Strother, supra.* The primary criterion is that the parties enter into an agreement as owners or principals in the endeavor. *Evertson, supra.* Therefore, even a close relationship between two parties does not create an implied joint venture. See *id.*

As evidence of the joint operation of the corporate defendants, Global relies upon the affiliation agreement originally between the university and Creighton Omaha Regional, and later transferred to AMISUB. It also argues that a suit by the university against American Medical and AMISUB for breach of that agreement evidences an intent to jointly operate the hospital.

However, although facilities are shared for mutual benefit, an affiliation agreement, without more, does not create the relationship of joint venturer between hospital and university. In *Dillard v. Rowland*, 520 S.W.2d 81 (Mo. App. 1974), in a situation similar to the one now before us, an infirmary physician who was discharged by a medical school employee brought suit against the infirmary, seeking damages and reinstatement to the infirmary's medical staff, alleging that a joint venture existed between the medical school and the infirmary. The *Dillard* court ruled that no joint venture existed despite the existence of a contract between the infirmary and the medical school providing that medical staffing for the infirmary would consist solely of medical school faculty members, the existence of a joint medical advisory board, and the fact that net earnings and losses would be split equally between the two organizations. The *Dillard* court found that the agreement between the two institutions gave neither of them the right to control any of the operations of the other and that the direction and management of each organization were completely separate from the other.

Such is the situation here. At the time the affiliation agreement in question was assigned to AMISUB, the university had 18 affiliation agreements with hospitals other than Saint

Joseph, and AMISUB had 9 such affiliations. Despite Global's allegations of a joint venture, the subject affiliation agreement makes clear that the parties recognize and intend to preserve the separate existence of the two institutions and the independence of their financial resources and obligations.

Global appears to contend that the agreement between Creighton Omaha Regional and American Medical for transfer of the hospital's assets constitutes not a sale, but a lease, evidencing a joint venture. According to the agreement, AMISUB would pay Creighton Omaha Regional $79,120,000 in cash for the lease of assets, plus an additional $20,180,000 payable at such time as Creighton Omaha Regional discharged certain liabilities, together with an undetermined amount adjusted against net working capital. In return, Creighton Omaha Regional would execute a lease to AMISUB for a period of 14 years with an option permitting AMISUB to purchase the assets at the end of the lease term for $1,000.

If a lease is intended to stand as security, a lease agreement can be considered a contract of sale. In *Reyna Financial Corp. v. Lewis Serv. Ctr.*, 229 Neb. 878, 429 N.W.2d 380 (1988), a dispute arose out of an agreement which provided for the lease of computer equipment and programming for 84 monthly installments of $1,724.77. The agreement further provided an option to the defendant to purchase the equipment for $1 at the expiration of the lease term. We held that the agreement created a contract of sale, the lease clearly being intended as security. The lease in *Crowder v. Allied Investment Co.*, 190 Neb. 487, 209 N.W.2d 141 (1973), which called for only a 4-percent additional consideration should the option to purchase be exercised, was also considered to be a contract of sale. In reaching that determination, the *Crowder* court distinguished that amount of consideration from the more substantial amount required to exercise the option to purchase at the end of the term in the lease involved in *Gibreal Auto Sales, Inc. v. Missouri Valley Machinery Co.*, 186 Neb. 763, 186 N.W.2d 719 (1971), which was held not to be a contract of sale. Here, the amount to be paid to exercise the option to purchase at the end of the lease term pales into nonexistence when compared to the total consideration involved. The transfer of the hospital's

assets was indeed a sale.

Global also contends that a joint venture exists between Creighton Omaha Regional, the foundation, and the university. This assertion is based on the facts that a provision in the foundation's articles provides that its funds may be distributed for the use of the university and the medical center as an "integral component" of the university; that money from the transfer of the hospital went to the foundation; that, as previously noted in part IV(1) above, one of the foundation's incorporators also once served as the president of the university and as a director-trustee of Creighton Omaha Regional; and that there exists a news article in which an attorney for Creighton Omaha Regional is reported to have said that about $38 million in assets from the transfer of the hospital went to the foundation. But none of these circumstances establishes the existence of any of the elements required to create a joint venture.

Quite simply, Global failed to make a prima facie case that the corporate defendants are engaged in a joint venture. There was no evidence that any of the corporations had an equal voice in controlling the manner in which the hospital was run; no evidence that American Medical, the foundation, or the university has ever exercised any control over the day-to-day operations or collection activities of the hospital; and most importantly, no evidence that any of the corporations shared in the profits of the hospital, other than American Medical as a stockholder. Pooled labor and skill is insufficient to establish a joint venture. *Fangmeyer v. Reinwald*, 200 Neb. 120, 263 N.W.2d 428 (1978).

## V. JUDGMENT

The record establishes that there exist no genuine issues concerning any material facts or the ultimate inferences that may be drawn from those facts and that the corporate defendants are entitled to judgment as a matter of law. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

WHITE and SHANAHAN, JJ., not participating.