MARVIN WINSLOW, APPELLANT, V. CHAD D. HAMMER AND JOHN HAMMER, APPELLEES.

527 N.W.2d 631

Filed February 17, 1995. No. S-93-356.

Vincent M. Powers for appellant.

John W. Ballew, Jr., of Baylor, Evnen, Curtiss, Grimit & Witt, for appellees.

HASTINGS, C.J., WHITE, CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ.

CONNOLLY, J.

This case involves an appeal by the plaintiff, Marvin Winslow, from a jury verdict which found that Marvin was not entitled to damages in his negligence action against the defendants, Chad D. Hammer and John Hammer. Marvin argues that the trial court erred in overruling Marvin's motion for directed verdict as to Chad Hammer's negligence and that the trial court should not have instructed the jury on the defenses of joint enterprise, assumption of risk, and contributory negligence. For the reasons stated below, we reverse the jury's verdict and remand the cause for a new trial.

## I. FACTUAL BACKGROUND

This case involves an automobile collision which occurred on

June 4, 1991. A 1979 Monte Carlo driven by defendant Chad Hammer collided head on with a vehicle driven by Mary Winslow in which the plaintiff, Marvin Winslow, was a passenger. The collision occurred on Highway 112, a two–lane highway containing one lane of eastbound traffic and one lane of westbound traffic. Chad was driving his Monte Carlo in the westbound lane. The collision occurred when Chad attempted to pass a westbound vehicle driven by Dennis York and collided with the Winslow vehicle, which was traveling eastbound. The collision occurred in the eastbound lane of traffic.

### 1. The Winslows' Activities Prior to the Collision

Marvin and Mary Winslow had spent the afternoon and early evening of June 4 at the residence of Eva Stover, Mary Winslow's sister. Marvin had agreed earlier in the day to help Stover with some gardening. After Marvin got off work that afternoon, he and the Winslows' son transported a tiller in the son's pickup truck to Stover's residence. Mary and the Winslows' daughters arrived a short time later in the Winslows' Plymouth Voyager minivan, which Marvin and Mary owned jointly.

Marvin spent the afternoon and evening working in Stover's garden. The Winslows' children got tired before Marvin finished, so the children left in the son's pickup. After Marvin finished the garden work, he and Mary left the Stover residence in the Winslows' minivan. Mary was driving.

### 2. Collision with the Deer

On the trip home, the Winslows collided with a deer just east of a cemetery outside the town of Fairbury. The Winslows proceeded to the next farmhouse, located approximately one–half mile away, and requested that a resident of the farmhouse call the police and inform them that the Winslows had hit a deer. The Winslows then returned to the site of the accident. Jefferson County Deputy Sheriff John E. Schmuck arrived at the accident scene shortly thereafter. Deputy Schmuck spoke with the Winslows about the accident, and Marvin and the deputy visually inspected the front of the minivan. The passenger side of the minivan had been heavily damaged, and the right headlight was not working. There was

also some damage to the grille of the vehicle, but the left (driver's side) headlight appeared to be working properly. No one checked to see if the left headlight had been jarred loose.

The Winslows left the accident scene and continued on Highway 112 toward Wymore. Mary and Marvin testified that they had no problem seeing the road with the left headlight, even though the area they were driving through was very dark. The Winslows were traveling at approximately 25 to 35 miles per hour, because Marvin was worried about the radiator overheating.

### 3. Westbound Vehicles

Defendant Chad Hammer was driving his Monte Carlo westbound on Highway 112, returning home from a baseball game that had ended sometime between 10 and 10:30 p.m. Chad proceeded at a speed of approximately 56 or 57 miles per hour until he caught up to a vehicle driven by Dennis York. The York vehicle was traveling at approximately 50 miles per hour.

Dennis testified that as he was driving westbound on Highway 112 toward Fairbury, he noticed a light in the distance. The record reflects that the light Dennis spoke of emanated from the Winslow minivan's left headlight. Dennis asked his wife, Nancy, if she thought it was a motorcycle headlight. Up to that point, Nancy had not noticed the light. Dennis testified that he saw the light for approximately 10 seconds before the Winslow minivan collided with Chad's Monte Carlo.

Chad had been following the York vehicle for about three-quarters of a mile when he decided to pass it. Chad testified that he peeked around the York vehicle a couple of times and, seeing nothing, pulled into the left lane and began to pass the York vehicle.

### 4. Collision with Chad Hammer

Dennis and Nancy York had noticed Chad's car when it came up behind the York vehicle. Nancy testified that at about the time Chad pulled into the passing lane, the light that Dennis had inquired about a few seconds before disappeared, but only for a fraction of a second. Apparently, there were some small dips in the highway, and the Winslow minivan had entered the trough of one of those dips. When Dennis realized that Chad was going

to attempt to pass him, he said aloud something to the effect of, "Don't try it." Sensing the impending collision, Nancy tried to put her seatbelt on. When Chad's car had reached the front driver's side door of the York vehicle, Chad collided head on with the Winslow minivan.

Chad testified that when he realized that he was going to hit the oncoming vehicle, he swerved to the left to try to avoid the collision. Chad stated that he could not pull back into the right lane behind the York vehicle because his Monte Carlo was going too fast. Chad testified that he had been about one car length behind the York vehicle when he attempted to pass it. Chad's car and the Winslow minivan collided, with the right front side of Chad's car striking the right front side of the Winslow minivan.

## 5. LAWSUIT

Marvin brought this negligence action against Chad and his father, John Hammer. John was named a party to the lawsuit under the family purpose doctrine. Both Chad and John answered Marvin's petition by asserting the affirmative defenses of joint enterprise, assumption of risk, and contributory negligence. The case was tried before a jury, which returned a general verdict in favor of the Hammers and against Marvin.

## II. ASSIGNMENTS OF ERROR

Marvin assigned five errors on appeal: (1) The trial court erred in failing to grant Marvin's motion for directed verdict as to Chad's negligence; (2) the trial court erred in instructing the jury on the joint enterprise theory; (3) the trial court erred in instructing the jury on assumption of risk; (4) the trial court erred in instructing the jury on contributory negligence; and (5) even if the contributory negligence instruction was properly given, the instruction given by the trial court was improper because it misstated the law.

## III. STANDARD OF REVIEW

A civil verdict will not be set aside where evidence is in conflict or where reasonable minds may reach different conclusions or inferences, as it is within the jury's province to decide issues of fact. *Terry v. Duff*, 246 Neb. 524, 519 N.W.2d

550 (1994); *Kozeny v. Miller*, 243 Neb. 402, 499 N.W.2d 75 (1993). As to questions of law, an appellate court has an obligation to reach a conclusion independent from a trial court's conclusion in a judgment under review. *In re Guardianship & Conservatorship of Bloomquist*, 246 Neb. 711, 523 N.W.2d 352 (1994); *National Acct. Sys. of Lincoln v. Vergith*, 246 Neb. 604, 521 N.W.2d 910 (1994); *Upah v. Ancona Bros. Co.*, 246 Neb. 585, 521 N.W.2d 895 (1994).

## IV. ANALYSIS

### 1. DIRECTED VERDICT

In his first assignment of error, Marvin contends that the trial court erred in overruling Marvin's motion for directed verdict as to Chad's negligence. Marvin argued that the uncontradicted evidence disclosed that Chad was negligent as a matter of law in failing to keep a proper lookout, trying to pass the York vehicle when it was unsafe to do so, driving too fast for the conditions, failing to have his vehicle under reasonable control, and failing to yield the right-of-way.

In reviewing the action of a trial court, an appellate court must treat a motion for directed verdict as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. In order to sustain a motion for directed verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion from the evidence. *Larsen v. First Bank*, 245 Neb. 950, 515 N.W.2d 804 (1994); *Rohde v. Farmers Alliance Mut. Ins. Co.*, 244 Neb. 863, 509 N.W.2d 618 (1994); *Wilson v. Misko*, 244 Neb. 526, 508 N.W.2d 238 (1993).

Having reviewed the record and having resolved any controverted facts and reasonable inferences which can be drawn therefrom in Chad's favor, we find this assignment of error to be without merit.

### 2. JOINT ENTERPRISE THEORY

As his second assignment of error, Marvin contends that the

trial court erred when it instructed the jury on the joint enterprise theory because the facts in the instant case could not have supported a finding of joint enterprise. The trial court instructed the jury that Chad was presenting a defense wherein Chad alleged that "at the time of the accident [Marvin and Mary] were engaged in a joint enterprise and that by virtue of that fact, any negligence of Mary [was] imputed to [Marvin] as his negligence." The trial court defined joint enterprise as follows:

> Two or more persons are said to be engaged in a joint enterprise when the following elements are found to exist:
>
> 1. An agreement, expressed or implied, between such persons to enter into an undertaking;
>
> 2. A common purpose to be carried out by such undertaking;
>
> 3. A common interest in that purpose among such persons, and
>
> 4. An equal right in each of such persons to control the manner of performance and the agencies used therein although such performance may be entrusted to one or fewer than all of such persons. Such equal right of control may arise when the nonperforming person makes or joins in making affirmative decisions with the performing person as to the operation of the means of carrying out the common purpose.

The trial court's jury instruction defined joint enterprise in accordance with the definition stated in *Strother v. Herold*, 230 Neb. 801, 433 N.W.2d 535 (1989). Accord, *Kremlacek v. Sedlacek*, 190 Neb. 460, 209 N.W.2d 149 (1973); *Kleinknecht v. McNulty*, 169 Neb. 470, 100 N.W.2d 77 (1959); *Bartek v. Glasers Provisions Co., Inc.*, 160 Neb. 794, 71 N.W.2d 466 (1955). However, our review of the language in *Strother* now leads us to believe that an additional element is necessary to properly define joint enterprise under Nebraska law.

The Restatement (Second) of Torts § 491, comment *c*. at 548 (1965), defines joint enterprise as follows:

> The elements which are essential to a joint enterprise are commonly stated to be four: (1) an agreement, express or implied, among the members of the group; (2) a common

purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

The jury instruction administered by the trial court in the case at bar, as dictated by *Strother*, was consistent with the elements set forth in the Restatement, except for the third element. The trial court did not include language indicating that the jury had to find a common *pecuniary* interest between Marvin and Mary. Rather, from the instruction administered by the trial court, the jury could have applied the joint enterprise theory to any common interest shared by Marvin and Mary, pecuniary or not.

While this court has never specifically held that the joint enterprise defense in negligence cases should be limited to situations where the parties share a pecuniary interest, we believe that such a rule is preferable.

> The doctrine of "joint enterprise" derives from the principles of agency and partnership law. [Citation omitted.] It is an undertaking to carry out a small number of acts or objectives, which is entered into by associates under such circumstances that all have an equal voice in directing the conduct of the enterprise. The law then considers that each associate is the agent or servant of the others, and that the act of any one within the scope of the enterprise is to be charged vicariously against the rest. [Citation omitted.] Vicarious liability means that, by reason of some relation existing between two parties, the negligence of the first is to be charged against the second, although the second has played no part in it, and has done nothing whatever to aid or encourage it, or indeed has done everything he can to prevent it. The justification for vicarious liability is a rule of policy, a deliberate allocation of a risk. [Citation omitted.]
>
> . . . "By limiting the application of the doctrine to an enterprise having a business or pecuniary purpose, we will be avoiding the imposition of a basically commercial concept to non–commercial situations which are more often matters of friendly or family cooperation and

accommodation." [*Easter v. McNabb*, 97 Idaho 180, 182, 541 P.2d 604, 606 (1975)], *citing* PROSSER, THE LAW OF TORTS § 72 (4th Ed.1971).

*Maselli v. Ginner*, 119 Idaho 702, 705, 809 P.2d 1181, 1184 (Idaho App. 1991). See, also, *Campanella v. Zajic*, 62 Ill. App. 3d 886, 379 N.E.2d 866 (1978) (limiting application of the joint enterprise defense in negligence actions to business enterprises); *Popejoy v. Steinle*, 820 P.2d 545 (Wyo. 1991) (same).

We now hold that in order to allege a joint enterprise or joint venture defense in a negligence case, a defendant must, in addition to proving the elements set forth in *Strother*, provide evidence of a common pecuniary interest between the parties alleged to be involved in the joint enterprise. In doing so, we officially adopt the definition of joint enterprise set forth above from the Restatement. Our holding promotes the more desirable policy of limiting the joint enterprise defense to its business and commercial roots. See *Maselli v. Ginner, supra.*

In the case at bar, there was no evidence of a pecuniary relationship between Marvin and Mary. The situation in the instant case was a normal family outing interrupted by a collision with a deer, and not the joint enterprise contemplated by the rule we have stated. See *Bartek v. Glasers Provisions Co., Inc., supra.* See, also, *Maselli v. Ginner, supra.* Therefore, it was error for the trial court to instruct the jury regarding the joint enterprise defense.

Our finding that the trial court erred in instructing the jury as to the joint enterprise theory necessitates that we reverse the jury's verdict and remand the instant case for a new trial. However, we must address Marvin's contention regarding the assumption of risk defense in the event that the issue arises on retrial.

### 3. ASSUMPTION OF RISK

As his third assignment of error, Marvin argued that the trial court should not have instructed the jury on the assumption of risk defense. The challenged jury instruction read, in part:

A. Issues

In defense to the plaintiff's claim, the defendants claim

that the plaintiff assumed the risk of any injury or damages he suffered by reason of his assuming the risk of riding in a motor vehicle at night with a defective or damaged headlight.

. . . .

B. Burden of Proof

In connection with this defense of assumption of risk, the burden is upon the defendants to prove by the greater weight of the evidence each and all of the following:

1. That the plaintiff knew of and understood the specific danger of riding in an automobile with a defective or damaged headlight.

2. That the plaintiff voluntarily exposed himself to that danger; and

3. That the plaintiff's injury and damages occurred as a result of exposure to that danger.

When a defendant pleads the affirmative defense of assumption of risk in a negligence action, the defendant has the burden to establish the elements of assumption of risk before that defense, as a question of fact, may be submitted to the jury. *Storjohn v. Fay*, 246 Neb. 454, 519 N.W.2d 521 (1994). Before the issue of assumption of risk may be submitted to the jury, evidence must show that the plaintiff knew of the danger, understood the danger, and voluntarily exposed himself or herself to the danger which proximately caused the plaintiff's injury. *McDermott v. Platte Cty. Ag. Socy.*, 245 Neb. 698, 515 N.W.2d 121 (1994).

In *Grote v. Meyers Land & Cattle Co.*, 240 Neb. 959, 970, 485 N.W.2d 748, 757–58 (1992), this court stated:

" 'Before the defense of assumption of risk is submissible to a jury, evidence must show that the plaintiff (1) knew of the danger, (2) understood the danger, and (3) voluntarily exposed himself or herself to the danger which proximately caused the plaintiff's damage. [Citations omitted.] "[E]xcept where he expressly so agrees, a plaintiff does not assume a risk of harm *arising from the defendant's conduct* unless he then knows of the existence of the risk and appreciates its unreasonable character, or the danger involved, including the magnitude thereof, and

voluntarily accepts the risk." . . .' "
(Emphasis supplied.) (Quoting *Sikyta v. Arrow Stage Lines*, 238 Neb. 289, 470 N.W.2d 724 (1991)). Accord *Mandery v. Chronicle Broadcasting Co.*, 228 Neb. 391, 423 N.W.2d 115 (1988). In reference to assumption of risk, Prosser and Keeton stated:

> [T]he plaintiff is aware of a risk *that has already been created by the negligence of the defendant*, yet chooses voluntarily to proceed to encounter it—as where he has been supplied with a chattel which he knows to be unsafe, yet proceeds to use it anyway; or where he proceeds to walk over debris on the sidewalk carelessly strewn and left there by a construction contractor. If these are voluntary choices, the plaintiff may be found to have accepted the situation, and consented to relieve the defendant of his duty.

(Emphasis supplied.) W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 68 at 481 (5th ed. 1984).

> A plaintiff who voluntarily exposed himself or his property to a known and appreciated danger *due to the negligence of defendant* may not recover for injuries sustained thereby . . . . On the other hand, recovery will be defeated only when the negligence causing the injury can reasonably be considered as having been included in the risk to which his position exposed him. *The doctrine of assumption of risk is inapplicable . . . where, apart from the assumed risk, defendant or a third person was negligent, and such negligence was the proximate cause of the injury suffered, unless plaintiff participated in such negligent acts or knew or had reason to believe that they were being committed or were about to be committed.*

(Emphasis supplied.) 65A C.J.S. *Negligence* § 174(4) at 299–300 (1966).

As indicated by the cited propositions, a defendant may assert the assumption of risk defense only when the facts indicate that the plaintiff has knowingly assumed the risk of a dangerous situation created by the negligence of the *defendant*. See the Restatement, *supra*, § 496A. In the case at bar, Chad argues that Marvin assumed the risk of riding in the minivan when it

had only one headlight. However, that danger, if it was a danger, was not created by Chad. Rather, it was created when the minivan struck a deer.

One does not assume the risk of unknown or hidden dangers. *Vanek v. Prohaska*, 233 Neb. 848, 448 N.W.2d 573 (1989); *Mandery v. Chronicle Broadcasting Co., supra*. Marvin could not have assumed the risk of the danger created by Chad, because that danger was unknown to Marvin. Thus, it was improper for the trial court to instruct the jury on the assumption of risk defense.

### 4. CONTRIBUTORY NEGLIGENCE

In his fourth and fifth assignments of error, Marvin contends that the trial court erred when it instructed the jury on the contributory negligence defense and that the instruction administered by the trial court misstated the law. A review of the jury instructions and the arguments set forth in the parties' appellate briefs reflects that the only contributory negligence alleged by Chad was directed at Mary's act of driving with a missing headlight. No contributory negligence was alleged to have arisen directly from any act performed by Marvin. We held above that any negligence on Mary's part could not be imputed to Marvin. Therefore, we must also hold that it was error for the trial court to instruct the jury on contributory negligence. Our decision makes it unnecessary to address Marvin's contention that the trial court's contributory negligence instruction misstated the law.

### V. CONCLUSION

Construing the evidence most favorably to Chad, we determine that the trial court did not err in refusing to direct a verdict in Marvin's favor with regard to Chad's alleged negligence. However, the trial court did err when it instructed the jury on the affirmative defenses of joint enterprise, assumption of risk, and contributory negligence.

REVERSED AND REMANDED FOR A NEW TRIAL.

WHITE, J., concurs.