CLINTEN LACKMAN, APPELLEE, V. ROGER ROUSSELLE AND VIRGINIA ROUSSELLE, DEFENDANTS AND THIRD-PARTY PLAINTIFFS, APPELLANTS AND CROSS-APPELLEES, AND JACK LACKMAN, THIRD-PARTY DEFENDANT, APPELLEE AND CROSS-APPELLANT.

585 N.W. 2d 469

Filed September 29, 1998. No. A-97-489.

P. Shawn McCann, of Sodoro, Daly & Sodoro, for appellants.

Robert M. Brenner, of Robert M. Brenner Law Office, for appellee Clinten Lackman.

Leland K. Kovarik, of Holtorf, Kovarik, Ellison & Mathis, P.C., for appellee Jack Lackman.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

SIEVERS, Judge.

This case stems from a low-speed collision of two pickup trucks on what is best described as a dirt road in a farm field. The appeal concerns whether a farmer husband and his homemaker wife are involved in a joint enterprise so as to impute the husband's negligence to the wife. Second, we discuss the failure to instruct the jury that it must separately assess any economic and noneconomic damages sustained by the plaintiff.

## FACTUAL BACKGROUND

This accident occurred on June 29, 1992, when a 1979 blue Ford pickup owned by Roger Rousselle and Virginia Rousselle and driven by Roger collided with a 1979 maroon GMC pickup driven by Jack Lackman, the father of the plaintiff, Clinten Lackman, who was a passenger in his father's pickup. The Lackman pickup was traveling northbound, and the Rousselle pickup was headed south. Both drivers had an unobstructed view as they approached each other on this essentially flat dirt road located near the Nebraska-Wyoming border in a farm field 2 miles north and one-fourth mile west of Lyman, Nebraska. On the west side of the road was a cornfield with 2- to 3-foot-tall corn, and to the east was a beanfield with a gravity irrigation pipe running parallel to the road to irrigate the beanfield. We shall use the term "field road" as the most accurate description of the locale of the collision.

There was a headgate for the irrigation ditch approximately 100 to 200 feet south of the accident site. Jack and Clinten had been at the headgate and were northbound from there on the field road as Roger proceeded southbound toward the headgate. According to Roger, Clinten was on the passenger side looking straight ahead, and Jack was looking straight at Roger. Roger observed the Lackman vehicle slowing down, and he applied his brakes. The vehicles hit each other at a low-speed impact. Neither Roger nor Jack were injured, and both vehicles sustained damage only to their bumpers. The vehicles came together in an offset position, with the Lackman vehicle generally in the middle of the road and the Rousselle vehicle on the right side of the road. A postcrash photograph of the vehicles on the field road before they were moved is in the record. The offset was described by Roger as 21 inches off the center of the road. Three different experts testified as to the velocity at the time of impact and placed it at 6 m.p.h., 7 to 9 m.p.h., and 8.6 m.p.h. The testimony of the Lackmans was that they were checking the pipeline for leaks as they proceeded northbound and that Clinten was on the passenger side with his arm, head, and upper body out of the window looking for leaks in the pipe. Clinten testified that his father was driving slowly and close to the pipeline. Clinten testified that the vehicles could have actually passed on the road without hitting each other.

Jack testified that he was driving on the hill "[n]ot very fast." Jack testified that he was not looking down the road, rather, he was looking at the irrigation pipes and gates prior to impact. Jack testified he saw the Rousselle pickup out of the corner of his eye, looked up, and stopped prior to impact. Jack said that at impact, he was jarred back a little and that he had grabbed the steering wheel to brace himself.

At the time of the accident, Clinten was working for his father's farming operation doing such things as cutting and baling hay, cultivating corn, driving equipment, setting gravity irrigation tubes, and whatever else his father told him to do in the farming operation on a day-to-day basis. Clinten stated that he had been farming full time since the summer of 1989 after he graduated from high school but that he did not file an income tax return until 1995. Clinten has never been paid a wage, a

bonus, or a share in the crops. Instead, his father simply provided for his needs, including putting money in his checking account. Clinten claimed a personal injury from the accident in the nature of torn interspinous ligaments in his neck which would require a surgical procedure at the C6-7 level of the vertebrae. Clinten wore a cervical collar for 3 months after the accident, but he had continued to work for his father in the farming operation and did not miss any work.

The case was tried to a jury in Scotts Bluff County District Court in April 1997. Roger and Virginia brought Jack into the action as a third-party defendant. The jury returned a verdict in favor of Clinten and against both Roger and Virginia in the amount of $175,000. The jury imputed the negligence of Roger to Virginia under the joint enterprise doctrine. Under the court's instructions, the jury assessed the percentage of negligence of the parties as follows: 0 percent for Clinten; 90 percent for Roger; and for Jack, 10 percent. Using the jury's findings, the trial judge entered judgment against Roger and Virginia and in favor of Clinten in the amount of $175,000, plus taxable court costs, and a second judgment against Jack in favor of Roger and Virginia in the amount of $17,500, plus 10 percent of the taxable court costs. Motions for new trial were filed and overruled, and Roger and Virginia appealed to this court. Jack has cross-appealed with respect to whether the Rousselles are entitled to contribution from him and, if so, the extent of such contribution.

## ASSIGNMENTS OF ERROR

Roger and Virginia assign seven separate errors as follows: The trial court erred (1) in failing to instruct the jury on the general standard of care by which Clinten's conduct was to be judged, "after having instructed the jury on the driver's standard of care"; (2) in failing to instruct the jury to make a separate finding as to the amount of economic and noneconomic damages in a case involving the allocation of negligence between alleged joint tort-feasors; (3) in giving an instruction on future loss of earning capacity; (4) in admitting without proper foundation hearsay evidence from a motor vehicle accident investigation report; (5) in submitting the question of imputing Roger's negligence to Virginia under the joint enterprise doc-

trine; (6) in failing to submit the question of imputing Jack's negligence to Clinten under the joint enterprise doctrine; and (7) in failing to grant the Rousselles' motions for a directed verdict, judgment notwithstanding the verdict, and new trial.

## STANDARD OF REVIEW

A jury verdict will not be disturbed on appeal unless it is so clearly against the weight and reasonableness of the evidence and so disproportionate as to indicate that it was the result of passion, prejudice, mistake, or some other means not apparent in the record, or that the jury disregarded the evidence or rules of law. *Mahoney v. Nebraska Methodist Hosp.*, 251 Neb. 841, 560 N.W.2d 451 (1997). On questions of law, an appellate court has an obligation to reach independent conclusions irrespective of the decision made by the court below. *State v. McBride*, 252 Neb. 866, 567 N.W.2d 136 (1997).

## ANALYSIS

*Were Roger and Virginia Involved in Joint Enterprise?*

Virginia was sued by Clinten. His claim was that Roger's negligence should be imputed to Virginia under the joint enterprise doctrine, thereby making her jointly and severally liable with Roger. At the close of Clinten's evidence, Roger and Virginia moved for a directed verdict in Virginia's favor on this issue, but the court overruled that motion and submitted the question of joint enterprise to the jury.

Clinten asserts that Roger and Virginia waived any error in the trial court's ruling denying their motion for a directed verdict on this point at the close of Clinten's evidence, because they proceeded to introduce evidence thereafter. See *Kreus v. Stiles Service Ctr.*, 250 Neb. 526, 550 N.W.2d 320 (1996). However, our examination of the record shows that counsel for Roger and Virginia renewed the motion for directed verdict at the close of all evidence and that the motion was denied. There is no waiver of any error in the ruling on a motion for directed verdict when such motion is renewed at the close of all evidence. *Spulak v. Tower Ins. Co.*, 251 Neb. 784, 559 N.W.2d 197 (1997); *State v. Severin*, 250 Neb. 841, 553 N.W.2d 452 (1996). Other than this, Clinten's brief does not contain any argument on this point.

The trial court's instructions imposed the burden upon Clinten to establish four elements of joint enterprise:

1. That Roger and Virginia Rousselle had an expressed or implied agreement to engage in a business activity.

2. That they had a mutual interest in the profits or benefits of the business activity.

3. That they had equal authority to control the performance of the business activity, even if some of them g[a]ve up or never exercise[d] that authority.

4. That Roger Rousselle acted with the authority of Virginia Rousselle; or did the kind of thing the joint venture is in business to do; did it substantially within any authorized limits on time and place; and did it with at least the partial intention of furthering the interest of the joint venture.

 The Rousselles cite *Global Credit Servs. v. AMISUB*, 244 Neb. 681, 508 N.W.2d 836 (1993), as setting forth the elements of a prima facie case against a defendant under the joint enterprise doctrine. The court in *Global Credit Servs.* held:

A joint venture can exist only by voluntary agreement of the parties and cannot arise by operation of law. . . . There must be an agreement to enter into an undertaking; the parties must have a community of interest in the object of the undertaking and a common purpose in performance; each of the parties must have an equal voice in the manner of performance and control over the agencies used. . . . The mere pooling of property, money, assets, skill, or knowledge does not create the relationship. . . . And there must be something more than mere sharing of profits; there must be some active participation in the enterprise and some control of the subject matter thereof or property engaged therein. . . . The absence of mutual interest in the profits or benefits is conclusive that a partnership or joint venture does not exist. . . . The primary criterion is that the parties enter into an agreement as owners or principals in the endeavor. . . . Therefore, even a close relationship between two parties does not create an implied joint venture.

(Citations omitted.) *Id.* at 690-91, 508 N.W.2d at 844.

■ To the extent that it was not sufficiently delineated in earlier cases, *Winslow v. Hammer*, 247 Neb. 418, 426, 527 N.W.2d 631, 636 (1995), makes it clear that in addition to the foregoing elements of joint enterprise, there must be evidence "of a common pecuniary interest between the parties alleged to be involved in the joint enterprise." See *Strother v. Herold*, 230 Neb. 801, 433 N.W.2d 535 (1989). *Winslow* states that the court "officially adopt[ed] the definition of joint enterprise" set forth in the Restatement (Second) of Torts, § 491, comment *c.* at 548 (1965). The Restatement provides that the four essential elements are

(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

The question of imputing Roger's negligence, if any, to Virginia involves the imputation of a farmer husband's negligence to his homemaker wife. We do not find a Nebraska case factually on point. Nonetheless, in *Morse v. Gray*, 166 Neb. 557, 89 N.W.2d 842 (1958), the court said that the negligence of the husband cannot be imputed to the wife where there is nothing in the evidence adduced to show any joint enterprise between the wife and the husband. The court in *Morse* quoted from *Bartek v. Glasers Provisions Co., Inc.*, 160 Neb. 794, 71 N.W.2d 466 (1955): " 'The negligence of a husband while driving an automobile with his wife as a guest may not be imputable to her . . . .' " *Morse*, 166 Neb. at 566, 89 N.W.2d at 848.

■ Here, Roger was alone in the vehicle, and any imputation of negligence must be premised on the alleged joint farming enterprise between Roger and Virginia. We have recited the instructions given by the court to the jury on this issue, as well as the four elements from the Restatement which must be proved. In examining the record in light of the four elements, we see two key issues: whether there was proof of an express or an implied agreement to enter into a joint enterprise between Roger and Virginia and whether there was proof that Roger and Virginia had equal authority to control the performance of the

farming operation. These are the first and fourth elements of the joint enterprise test. Generally, the mere existence of a marriage relationship does not have the effect of making the negligence of one spouse imputable to the other, but the existence of such a relationship will not preclude the negligence of one spouse from being imputed to the other. 65A C.J.S. *Negligence* § 159 (1966).

The Rousselle family had lived in San Jose, California, previously, where Virginia was employed as a registered nurse and Roger, who has a degree in electrical engineering, was a computer manager. Roger, who did not have a farm background, began farming when the family moved to Lyman. He farmed a piece of land owned by Virginia's mother, as well as land jointly owned with Virginia. The farming operation involved grain, as well as some cattle. Upon their move to the Lyman area in 1982, Virginia stopped working as a nurse because of a young and growing family. The Rousselles' four children, Melissa, Cara, Robert, and Ray, were ages 21, 19, 13, and 11, respectively, at the time of trial. Virginia testified that Roger was responsible for the day-to-day farming activities on their land, as well as her mother's land. She denied participating in any of the actual farming. Virginia testified that she never tilled the soil, prepared it for planting, drove a tractor, applied fertilizer or herbicides, cultivated, planted, or harvested. She admitted to setting irrigation tubes once when she went with her son who had been told by Roger to check water in a particular field. Virginia stated that she does not help Roger make decisions as to when or what crops are to be planted or what chemicals are to be used and that she does not know Roger's plans in the morning when he leaves the house unless he tells her. Virginia said she controls none of Roger's farming activities. Virginia testified that she did not make decisions about when to sell crops or to whom, nor did she know how much crops were sold for, nor did she check prices with the grain elevators.

Virginia's involvement in the farming operation can be summarized by stating that she pays the bills, both family- and farm-related, and on a very infrequent occasion, feeds cattle, sets an irrigation tube, or checks a headgate. All of the farm machinery and vehicles and land (other than her mother's land) is jointly

owned, she and Roger file joint income tax returns, and she signs the notes at the bank. However, her testimony was that "Roger goes in and talks to the banker without me, gets the note, and we sign it, and [he] takes it back in." Virginia's testimony reveals much about how the family operates:

Q. So, you benefitted from the farming just as Roger did?

A. Yes.

Q. Did you ever tell Roger that you thought he should do something different to the farming?

A. No.

Q. Why not?

A. He wouldn't have listened to me.

Q. Why wouldn't he listen to you?

A. I don't know nothin' [sic] about farming.

Q. So, you delegate that — you give him that right to perform that part of your relationship?

A. When we moved back to farm, that is what he was going to do to make a living was farm.

Q. So, you delegate that to him and you take care of the household?

A. No. That is our understanding. I didn't delegate.

Q. It was your understanding that you would take care of the children and the house, and he would do the farming as your livelihood?

A. Yes.

Q. And you didn't do any more nursing?

A. No.

Roger testified to nothing different about Virginia's involvement in the farming operation, nor was any other evidence offered by Clinten to show that Virginia had a different or more substantial role in the farming operation.

The most recent pronouncement of the Nebraska Supreme Court on joint enterprises is *Winslow v. Hammer*, 247 Neb. 418, 527 N.W.2d 631 (1995). The court emphasized the element of "a community of pecuniary interest in the purpose among the members," citing *Maselli v. Ginner*, 119 Idaho 702, 809 P.2d 1181 (Idaho App. 1991), which in turn relied upon William L. Prosser, The Law of Torts § 72 (4th ed. 1971): " ' "By limiting the

application of the doctrine to an enterprise having a business or pecuniary purpose, we will be avoiding the imposition of a basically commercial concept to non-commercial situations which are more often matters of friendly or family cooperation and accommodation." ' " *Winslow*, 247 Neb. at 425-26, 527 N.W.2d at 636.

We believe that this succinct reasoning is particularly applicable to the evidential record here, which really shows nothing more than a marriage between Virginia and Roger where each works: she runs a household with four children, and he provides the family's livelihood by farming. We find no evidence in the record to support the first and fourth elements of the test for joint enterprise. There is no evidence of an agreement, express or implied, that Roger and Virginia will jointly engage in the business of farming. The only thing resembling an agreement in the record is that which obviously and naturally occurs because of their shared interests as husband and wife working together to raise their family. In short, the evidence proves a family relationship, not a commercial one. Second, there is no evidence whatsoever that Virginia has the right of control or an equal voice in the farming operation. In fact, the evidence is abundantly clear that she has no knowledge, interest, control, or voice in how the farm will be run. The fact that she manages what can be described as the family checkbook and pays farming-related expenses at her husband's direction does not constitute an agreement to jointly engage in a common pecuniary enterprise with the right to equal control. We recognize that the element of control is not necessarily a matter of the exercise of control, but the right to do so. Nonetheless, there is no evidence here that Virginia had such a right concerning the farming operation, and certainly the record is undisputed that she in fact exercised no control over the farming operation.

The Iowa Supreme Court in *Farm Bureau Service Co. of Hardin Cty. v. Bavender*, 217 N.W.2d 560 (Iowa 1974), described a husband-and-wife farming operation similar to that evidenced in the record here, except that the wife did chores and fieldwork when needed, whereas the husband took care of the finances. The Iowa court there upheld the trial court's refusal to find that the husband and wife were engaged in a joint enter-

prise, using essentially the same tests we have previously outlined from Nebraska jurisprudence. The *Bavender* court held:

> The evidence in this case is totally lacking with regard to any voluntary agreement between the defendants to engage in a joint venture in the operation of their farming enterprise. Instead, the evidence demonstrates a typical joint ownership of property and the pooling of assets for common advantage between a husband and a wife. Certainly the evidence establishes the wife occasionally assisted with the chores and the field tasks, as did the children of the parties. However H. L. Bavender was not the employer of Helen Bavender, nor was he her business partner.

*Id.* at 563.

The *Bavender* court also stated: "We are not willing to impute the rule of joint venturer into the role of spouse. The evidence establishes conclusively to us that the activity of Helen Bavender was that traditionally associated with her role as a farm housewife." *Id.* at 564.

Some 24 years after *Bavender*, we are reluctant to label any marital relationship in the late 1990s as a "traditional" farm household. Nonetheless, we are convinced that the joint enterprise doctrine, in order to be applied to a husband and wife who happen to live on a family farm, must involve much more proof than that offered about the Rousselles on the central issues of the parties' agreement and the equality of control. In *Popejoy v. Steinle*, 820 P.2d 545 (Wyo. 1991), the Wyoming Supreme Court drew a distinction between joint enterprise, which is for the mutual benefit or pleasure of the parties, and joint venture, which are business ventures with commercial and profit motives, but the court declined to find joint venture in the wife's trip, during which an accident occurred, to purchase a calf for the daughter to raise, despite substantial evidence of joint venture between the husband and wife in a general ranching operation. The Wyoming court limited its analysis to whether the ranch couple was "engaged in a joint venture at the time of [the] accident." *Id.* at 551. In *G. R. Little Agency, Inc. v. Jennings*, 88 N.C. App. 107, 362 S.E.2d 807 (1987), the wife's use and enjoyment of profits from the former husband's farm business did not make the wife liable for the husband's business

farm debts, including an insurance policy on the husband's farm which she had procured prior to their divorce. The wife utilized the profits merely for living and subsistence purposes to which she, as the husband's wife, was entitled. See *Wood v. Claussen,* 207 S.W.2d 802 (Mo. App. 1948) (joint ownership of farm property without element of joint venture, i.e., joint carrying on of business enterprise for profit, prevents imputed liability from husband to wife).

Consequently, in the present case, in view of the evidence and the applicable law, the trial court should have granted the requested directed verdict in favor of Virginia, as there was inadequate proof as a matter of law of a joint enterprise. Thus, the district court is directed to dismiss the case as to Virginia.

### *Failure to Instruct Jury to Make Separate Findings for Economic and Noneconomic Damages.*

The date of this accident was June 29, 1992, which means that by virtue of Neb. Rev. Stat. § 25-21,185.07 (Reissue 1995), the newer rules with respect to contributory negligence and comparative negligence are applicable. Neb. Rev. Stat. § 25-21,185.09 (Reissue 1995) provides that the contributory negligence chargeable to a claimant shall diminish proportionately the amount awarded as damages for an injury attributable to the claimant's contributory negligence but shall not bar recovery, unless the contributory negligence is equal to or greater than the total negligence of all persons against whom recovery is sought. In the instant case, the jury made an express finding that Clinten's negligence was 0 percent. Therefore, this statute does not apply to reduce Clinten's recovery. However, Roger argues that a related statute, Neb. Rev. Stat. § 25-21,185.10 (Reissue 1995), does apply. This statute provides:

> In an action involving more than one defendant when two or more defendants as part of a common enterprise or plan act in concert and cause harm, the liability of each such defendant for economic and noneconomic damages shall be joint and several.

> In any other action involving more than one defendant, the liability of each defendant for economic damages shall be joint and several and the liability of each defendant for

noneconomic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of noneconomic damages allocated to that defendant in direct proportion to that defendant's percentage of negligence, and a separate judgment shall be rendered against that defendant for that amount.

Clinten sought recovery for both economic and noneconomic damages, and both types of damages were submitted to the jury. Roger's argument is that notwithstanding that Jack was a third-party defendant, the jury should have determined the percentage of negligence attributable to each Jack and Roger and then the second paragraph of § 25-21,185.10 quoted above would determine the precise nature and extent of their liability. Roger argues that Roger's and Jack's liability would be joint and several for economic damages but that there would be only several liability for noneconomic damages. See Neb. Rev. Stat. § 25-21,185.08 (Reissue 1995) (defining economic damages as "monetary losses" and noneconomic damages as "subjective, nonmonetary losses"). The jury, as instructed, separately assessed the percentage of negligence chargeable to Roger and Jack. But the trial court failed to require the jury to separately determine Clinten's economic and noneconomic damages. Roger acknowledges that no party requested that the jury make such a finding, but he relies upon the rule that whether requested to do so or not, a trial court has the duty of instructing on issues presented by the pleadings and the evidence, and the failure to do so constitutes prejudicial error. *Burns v. Metz*, 245 Neb. 428, 513 N.W.2d 505 (1994). Appellate courts reserve the right to note plain error which was not complained of at trial. *Russell v. State*, 247 Neb. 885, 531 N.W.2d 212 (1995) (Lanphier, J., dissenting). Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Pantano v. McGowan*, 247 Neb. 894, 530 N.W.2d 912 (1995). That appellate courts will reach errors in jury instructions despite the lack of objection to, request for, or tender of a proper instruction, cannot be doubted. See *Wheeler v. Bagley*, 254 Neb. 232, 575 N.W.2d 616 (1998).

Roger sought contribution from Jack by alleging that Jack was also negligent, which negligence proximately contributed to any damages suffered by Clinten. The prerequisite for contribution is that the party seeking contribution and the party from whom it is sought must share a common liability. *Smith v. Kellerman*, 4 Neb. App. 178, 541 N.W.2d 59 (1995). Contribution is the sharing of the cost of an injury as opposed to a complete shifting of the cost from one to another, which is indemnification. *Id.* A common liability to the same person must exist in order for there to be contribution. *Rawson v. City of Omaha*, 212 Neb. 159, 322 N.W.2d 381 (1982). In *Smith, supra*, we disapproved the use of NJI2d Civ. 3.42 entitled "Concurring Cause" in a contribution action, saying that instructing that one person may be responsible for the entire injury when the negligence of two people allegedly combined to proximately cause the injury is the antithesis of contribution.

With this background about contribution, we return to the assigned error. In the case at hand, there is no claim that Roger and Jack were engaged in a joint enterprise which would make them jointly and severally liable for both economic and noneconomic damages under § 25-21,185.10. Without a joint enterprise, the statute makes them jointly and severally liable for Clinten's economic damages, but only severally liable for his noneconomic damages. See § 25-21,185.10. When there are multiple defendants, the plain language of § 25-21,185.10 requires that the trial court instruct the jury to make separate findings as to the amount of economic and noneconomic damages, which are defined in § 25-21,185.08, assuming, of course, that the evidence justifies the submission of either type of damage. This must be done in order for the statute to be correctly applied. Such findings determine the amount for which defendants such as Roger and Jack will be jointly and severally liable and the amount for which they will be only severally liable. The trial court erred in failing to instruct the jury to determine the amount of Clinten's economic and noneconomic damages.

And, of course, the actual amount of the individual's liability is directly dependent on how the jury divides the 100 percentage points of negligence between Clinten, Roger, and Jack, because § 25-21,185.10 requires proportionality. The Nebraska

Supreme Court recently held that it is plain error not to instruct the jury on the effects of their allocation of negligence. *Wheeler, supra.* In *Wheeler*, the court said that § 25-21,185.09 contains a clear mandate from the Nebraska Legislature that the jury be "fully and openly informed before making its determinations with respect to contributory negligence and the attendant allocation of negligence." *Wheeler*, 254 Neb. at 238, 575 N.W.2d at 619. See, also, *Fiscel v. Beach*, 254 Neb. 678, 578 N.W.2d 52 (1998) (reversing and remanding for new trial where jury was not instructed on effect of its allocation of negligence). In *Fiscel*, the need for such an instruction was described as "mandatory." *Id.* at 684, 578 N.W.2d at 57. *Wheeler* requires that the instruction on the effect of allocation be given when the cause of action arises after February 8, 1992, and "in which contributory negligence is a defense." *Wheeler*, 254 Neb. at 239, 575 N.W.2d at 620. Both conditions are satisfied here. Therefore, under *Wheeler* and *Fiscel*, the trial court in the instant case also erred in not instructing the jury about the effect of the allocation of negligence. In both *Wheeler* and *Fiscel*, the court found plain error from such failure, as we do here.

While we recognize that *Wheeler* and *Fiscel* are the most basic "plaintiff against defendant" cases, whereas this case involves a third-party claim by Roger against Jack, we do not see this difference as mandating a different outcome. The heart of the rationale of *Wheeler* is that the jury should not stumble blindly about trying to guess what effect its percentage allocation of negligence will have, nor should the jury try to "adjust" its damage award for the allocation without accurate information. That rationale carries just as much weight when the jury is allocating among multiple defendants, as in the present case. As pointed out in 3 Arthur Best, Comparative Negligence Law and Practice § 19.10(3)(c)(i) (1998), a system of allocation of fault that ignores patently responsible tort-feasors is needlessly impractical if a single action can include and adjudicate all parties potentially liable for a plaintiff's injuries. Efficient and equitable enforcement of contribution among multiple tort-feasors requires enforcement of contribution in the same proceeding. *Id.* Thus, the fact that Jack is a third-party defendant is of no consequence. That Jack is in the case via a third-party peti-

tion rather than sued originally by Clinten is a distinction without a difference.

Although we have already addressed two grounds for reversal, further problems are presented in the record because of how the trial court entered judgment on the jury's verdict. Obviously, the court could not enter a proper judgment because economic and noneconomic damages had not been separately assessed by the jury. Nonetheless, we think it is of some benefit in future trials to discuss the trial court's entry of judgment. The trial court entered a judgment against Roger for $175,000, or 100 percent of the total damages assessed by the jury, despite the jury's finding that Roger was only 90-percent negligent. But apparently as a form of "offset," the trial court then gave Roger a judgment against Jack for $17,500, or 10 percent of that amount. The trial judge's thought may have been to give Roger a chance to recoup 10 percent (the jury's assessment of Jack's negligence) from Jack of what Roger was to pay Clinten. But whether such judgment would actually serve to hold Roger's liability to 90 percent of the total damages is a function of whether Roger can collect $17,500 from Jack.

But most importantly, an offsetting judgment is not the result intended or required by the statute. We see § 25-21,185.10 as protecting a marginally or less culpable tort-feasor from the burden of joint and several liability for the entirety of the plaintiff's damages. This occurs under the new statute, because as between defendants, joint and several liability applies only to economic damages, when in many tort cases the greatest damages may well be noneconomic, e.g., for pain and suffering. With respect to amount of noneconomic damages, "[e]ach defendant shall be liable *only* for the amount of noneconomic damages allocated to that defendant in *direct proportion to that defendant's percentage of negligence*, and a separate judgment shall be rendered against that defendant for that amount." (Emphasis supplied.) § 25-21,185.10.

Thus, the third error was that when the trial court entered judgments upon the jury's verdict, it did not enter "a separate judgment . . . against" Roger and Jack, as the statute contemplates, for their proportional allocation of the noneconomic damages. The trial court's error in failing to require the jury to sepa-

rate economic and noneconomic damages inevitably led to the errors in the judgments entered upon the jury's verdict. Perhaps an example, in the context of this case, of how the statute should be applied will be of benefit to the trial bench and the bar.

Assuming, for illustration, that the jury had been instructed to separately assess Clinten's economic and noneconomic damages and did so at $10,000 and $165,000 respectively and using the percentages of negligence for Jack (10 percent) and Roger (90 percent) found by the jury, then the following result obtains under § 25-21,185.10. A judgment for $10,000 for economic damages should have been entered in Clinten's favor against Roger and Jack jointly and severally. A separate judgment in Clinten's favor against Roger for 90 percent of $165,000 (the noneconomic damages), or $148,500, should have been entered. Finally, a separate judgment in the amount of $16,500, or 10 percent of the noneconomic damages, should have been entered against Jack and in favor of Clinten.

Notwithstanding the absence of a request to instruct in accordance with § 25-21,185.10, the trial court must still properly instruct on material or relevant issues presented by the pleadings and the evidence. *Anderson v. Union Pacific RR. Co.*, 229 Neb. 321, 426 N.W.2d 518 (1988). The instructions were wrong in a number of ways, and thus the verdict must be reversed and the matter remanded for a new trial.

*Extent of Remand.*

To this point, we have decided a number of issues. First, the trial court should have sustained Virginia's motion for a directed verdict and dismissed her from the litigation. After a complete presentation of evidence on whether Roger and Virginia were involved in a joint enterprise, so as to allow the imputation of Roger's negligence to her, there was a failure of proof. As a matter of law, there was no joint enterprise between Virginia and Roger. Accordingly, the district court is directed to dismiss Virginia from the case.

Second, the district court erred in failing to have the jury separately determine Clinten's economic and noneconomic damages and in failing to advise the jury of the effect of its allocation of negligence. Finally, the court erred in entering an offsetting judgment in Roger's favor against Jack rather than

following the procedure for joint and several liability, had economic damages been assessed, including a proportional and separate judgment for Clinten's noneconomic damages. Thus, a new trial is required.

Although not briefed by the parties, the issue now naturally arises as to whether the jury's determination that Clinten was 0-percent negligent, that Roger was 90-percent negligent, and that Jack was 10-percent negligent is binding so that the only issue on retrial is the amount of economic and noneconomic damages. The answer to that question is provided by *Wheeler v. Bagley*, 254 Neb. 232, 575 N.W.2d 616 (1998), where the court held that the language from § 25-21,185.09, "[t]he jury shall be instructed on the effects of the allocation of negligence," means that the jury should be fully aware of the ramifications of its allocation of negligence "so that it may make a careful and considered determination regarding the apportionment of liability." *Wheeler*, 254 Neb. at 241-42, 575 N.W.2d at 621. Consequently, the court in *Wheeler* remanded the cause for a new trial on both damages and liability because the instruction, which was not given, affects the jury in its determination of liability and its attendant allocation of negligence. We read *Wheeler* as clear authority for the proposition that the present case must be retried on both liability and damages under proper instruction, which we believe may be found in *Wheeler, supra*; in *Fiscel v. Beach*, 254 Neb. 678, 578 N.W.2d 52 (1998); and in this opinion. Thus, the end result is a new trial, but without Virginia.

Roger also has an evidentiary assignment of error dealing with the admission of the motor vehicle accident report prepared by a deputy sheriff. An initial objection to exhibit 7 on foundation and relevance was overruled, and the document was received into evidence. Then, a second objection was made on hearsay grounds, but the court ruled: "I have already received it now." Given that the court's ruling appears to be a matter of the timing of the objection and a retrial has been ordered, no further comment on this evidentiary point is needed.

*Loss of Earning Capacity in Future.*

Roger assigns error to the trial court's submission to the jury as an element of Clinten's potential damage "[t]he reasonable

value of the earning capacity plaintiff is reasonably certain to lose in the future." Roger argues that the jury was allowed to engage in speculation and conjecture as to any future loss of earning capacity, citing *Uryasz v. Archbishop Bergan Mercy Hosp.*, 230 Neb. 323, 431 N.W.2d 617 (1988). The evidence in *Uryasz* was that the injured plaintiff had recovered about 90 percent; continued to have pain and numbness in her leg; and was unable to return to work and if she did, she would not work in a drugstore, as she could not stand on her legs that long and do a good job. An economist testified that Uryasz' future loss of earning capacity was $215,280. The Nebraska Supreme Court in *Uryasz* found that the economist's testimony concerning the plaintiff's diminution of earning capacity and its present worth was speculative and confusing to the jury. Nonetheless, the court found that the evidence, if believed, showed that the plaintiff had an injury and an impairment, in some indefinite degree, to her future earning capacity. However, relating the extent and permanency of that injury to Uryasz' job performance under the record would require the jury to engage in speculation and conjecture. In reversing the jury's verdict, the court held that the evidence "fails to prove with reasonable certainty the impairment of plaintiff's future earning capacity." *Id.* at 335, 431 N.W.2d at 625.

Examination of the record in the instant case reveals medical testimony that Clinten has sustained an injury to his cervical spine which will likely require surgical intervention. Dr. Terry Mark Himes testified with reasonable medical certainty that Clinten should have surgery to correct the motion between the C6-7 vertebrae, and the doctor described several different possible techniques. Dr. Himes described various adverse consequences of that surgery, including an accelerated rate of degenerative arthritic change. Dr. Himes gave an opinion that Clinten had suffered a 20-percent partial impairment of the whole body, that his activities would be limited, and that he would continue to experience limitations significant enough to restrict his activities in the area of farm work.

Roger relies upon *Schwab v. Allou Corp.*, 177 Neb. 342, 128 N.W.2d 835 (1964), to argue that the submission of loss of future earning capacity was error. In *Schwab*, the plaintiff, a

teacher, received injuries to a leg and was assigned a 10- to 15-percent disability, which was, according to the evidence, an inconvenience when she resumed teaching. The court found that there was a failure to prove with reasonable certainty that the injury impaired Schwab's earning capacity.

In dealing with the instant assignment of error, we remember that a new trial has been ordered on both liability and damages. Thus, we believe the only pronouncement we need make is that on the record before us, we cannot say that the trial court erred in submitting this element of damage to the jury on this record. But the trial court will once again need to evaluate this issue in light of the evidence at the retrial.

*Cross-Appeal.*

Jack has cross-appealed and assigns error to the trial court's conclusions that the Rousselles were entitled to contribution from him and that the Rousselles "were entitled to relief based on apportionment of fault." Jack also asserts that the trial court erred in failing to determine that the Rousselles were barred from recovering anything from Jack by Roger's negligence. We believe that our resolution of Roger's assignments of error dealing with the failure to instruct the jury on separate economic and noneconomic damages, as well as our commentary about the manner in which judgment was entered in this case, largely resolves the cross-appeal. However, we do take this opportunity to respond to the assertion made in brief by Jack that "two actions [were] being tried in this case, i.e., the case of Clinten Lackman against the Rousselles and the case of the Rousselles against Jack Lackman . . . each independently subject to the terms and requirements of the Nebraska Comparative Negligence Statute, to-wit, §25-21,185.07 [et seq.]" Brief for cross-appellant at 18.

We have already indicated our disagreement with this concept. In this instance, it is only the fact that Clinten sued only Roger, who then brought Jack in as a third-party defendant, which caused the parties to be lined up as plaintiff (Clinten) versus defendant and third-party plaintiff (Roger) versus third-party defendant (Jack). Procedural twists aside, this case is still a negligence action against two parties, Roger and Jack, who

are alleged to have each been negligent and a proximate cause of Clinten's damages. The basic job of the jury in this case was to determine if there was negligence, and if so by whom, and in what proportion. The jury's next task was to determine damages, separating economic from noneconomic, and then to apportion the damages according to the law of comparative negligence. To the extent feasible, we have tried to provide guidance for the retrial of this action which, as said, we do not see as two independent cases. Beyond this, no further comment is needed upon the cross-appeal. The cause is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

MUES, Judge, dissenting.

I respectfully dissent. I disagree with that portion of the majority's decision which finds error in the failure to instruct the jury to separately determine economic and noneconomic damages and in the manner in which the trial court entered judgment. If Clinten had sued both Roger and Jack as joint tort-feasors, I would wholeheartedly agree with the majority's conclusions. But Clinten did not sue *both* Roger and Jack—Clinten sued only Roger, seeking 100 percent of his recovery.

*Joinder of Tort-Feasors.*

It has long been the rule in this state that a plaintiff need not join all tort-feasors as defendants in an action for damages. See *Fick v. Herman*, 161 Neb. 110, 72 N.W.2d 598 (1955). The Nebraska Supreme Court has recently reaffirmed that rule in a suit by a bank for tortious conversion where the defendant argued a third party was necessary or indispensable. In finding that the bank was not required to join all possible joint tort-feasors, the Supreme Court stated: "A plaintiff need not join all tort-feasors as defendants in an action for damages. Every joint tort-feasor is liable for all damages to which his conduct has contributed, and it is no defense that these damages would not have occurred without the concurring misconduct of another person." *Battle Creek State Bank v. Preusker*, 253 Neb. 502, 512, 571 N.W.2d 294, 301 (1997).

It has also been said that a defendant may not tender a substitute defendant to the plaintiff by pleading that the cause of

the plaintiff's injury was the act of the third-party defendant and not of the original defendant, since a person may be brought in as a third party only if he is secondarily liable to the third person, rather than directly liable to the original plaintiff. 67A C.J.S. *Parties* § 98 (1978).

### Third-Party Practice.

Neb. Rev. Stat. § 25-331 (Reissue 1995) is Nebraska's impleader statute. Impleader is a procedural device which does not create substantive rights but merely accelerates the accrual of the right to assert a claim of liability over. See 67A C.J.S. *Parties* § 95 (1978). Thus, § 25-331 provides a procedure by which a defendant, "as a third-party plaintiff," may bring into an action a party who is or may be liable for all or part of the plaintiff's claim. Leave of court is required, and when authorized, the person brought in is called the "third-party defendant."

Of significance to my dissent is that impleader is not mandatory, nor is the plaintiff compelled to assert any claim against the third-party defendant, even one arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the original defendant. § 25-331. The court or any party may move to strike the third-party claim or for its severance or separate trial if the third-party claim should delay trial, might tend to confuse a jury, or in any way jeopardizes the rights of the plaintiff. *Id.*

A third-party claim under § 25-331 may be asserted when a third party's liability is in some way dependent upon the outcome of the main claim or when the third party is secondarily liable to the defendant. *Life Investors Ins. Co. v. Citizens Nat. Bank*, 223 Neb. 663, 392 N.W.2d 771 (1986). The basic function of third-party practice is the original defendant's seeking to transfer to the third-party defendant the liability asserted by the original plaintiff. *Id.* The granting of leave to file a third-party complaint is within the discretion of the trial judge. *Northwestern Bell Tel. Co. v. Woodmen of the World Life Ins. Soc.*, 189 Neb. 30, 199 N.W.2d 729 (1972).

### Contribution.

There is no dispute that Jack's involvement in this case is as a third-party defendant sued by Roger on a theory of contribu-

tion. Clinten asserted no claim against Jack after the impleader was allowed, nor was he compelled to do so under § 25-331. I believe any verdict for Clinten under a typical case prior to the passage of § 25-21,185.10 could only have been against Roger, the person Clinten sued. In turn, Roger would have been entitled to a judgment against Jack to shift a part of the common liability on the premise that Roger, in facing Clinten's judgment, would be discharging more than his fair share of the common liability. See, e.g., *Smith v. Kellerman*, 4 Neb. App. 178, 541 N.W.2d 59 (1995).

Generally, the method of contribution among joint tort-feasors varies. In some jurisdictions, it is pro rata or proportionate, based upon the number of tort-feasors. In others, each tort-feasor bears the loss in proportion to his fault. See 18 C.J.S. *Contribution* § 8 (1990). To my knowledge, Nebraska's method of apportioning loss between joint tort-feasors for purposes of contribution before § 25-21,185.10 has never been specifically defined by the Supreme Court.

*Statutory Construction.*

Statutory language is to be given its plain and ordinary meaning. This court will, if possible, try to avoid a construction which would lead to absurd, unconscionable, or unjust results. *Hilliard v. Robertson*, 253 Neb. 232, 570 N.W.2d 180 (1997). The majority essentially concludes that there is no rational distinction between Jack's status as a third-party defendant as opposed to that of an original defendant, when assessing the applicability of § 25-21,185.10. To reach that conclusion, the majority implicitly construes the term "defendant" in § 25-21,185.10 to include "third-party defendant," a term used only in § 25-331. The majority has read into the statute language which is not there, and I believe the construction it places on this section leads to several unjust results.

The first is that Clinten, not Roger, is forced to bear the risk of the collectibility of a judgment against Jack. As stated, in a third-party proceeding seeking contribution under § 25-331, the judgment would normally be in favor of the third-party plaintiff, Roger, as the trial court determined here. Next, it seems fundamentally wrong that a judgment be entered against someone and

in favor of another who has not sought it. Such a result defies basic pleading rules. Moreover, it contradicts the rule in *Fick v. Herman*, 161 Neb. 110, 72 N.W.2d 598 (1955), that a plaintiff cannot be forced to join all tort-feasors and the language of § 25-331 that a plaintiff is not compelled to assert a claim against the third-party defendant. By treating the third-party defendant, Jack, as if he were an original defendant sued by Clinten, the majority has effectively "joined" Jack as a tort-feasor for Clinten. If the intent of the Legislature in enacting § 25-21,185.10 was to abrogate the *Fick* rule and alter long-standing rules of procedure on necessary and indispensable parties, it seems it could have easily said so.

Moreover, although perhaps not "unjust," the majority's reasoning, if correct, accentuates yet another significant change brought about by § 25-21,185.10. The effect of the majority's conclusion is that the substantive common law of contribution between joint tort-feasors has been replaced by the provisions of § 25-21,185.10, a statute which, on its face, ostensibly applies only when a plaintiff seeks relief, not when a defendant seeks contribution from another tort-feasor.

While construing the formula of § 25-21,185.10 to be applicable to Roger's suit for contribution is an ingenious way to clarify a subject heretofore uncertain in this state, Nebraska's common law of allocating damages for contribution purposes was arguably much different than the legislatively imposed formula of § 25-21,185.10. See, e.g., 18 C.J.S. *Contribution* § 8 (methods of contribution vary, in some instances it being pro rata based upon number of tort-feasors). See, also, *Smith v. Kellerman, supra.*

Section 25-21,185.10 clearly evidences the Legislature's intent to limit a tort-feasor's liability to a plaintiff for noneconomic damages to a percentage of that tort-feasor's negligence when a plaintiff seeks to recover from more than one defendant. While I do not challenge the majority's logic in implying a similar intent as to third-party actions between tort-feasors for contribution, the statute does not address this topic, and it is one which I suspect is not normally associated with the statutory scheme which focuses on the liability of the defendants to the plaintiffs and not on the defendants' liability to one another.

In sum, I am not convinced that the issues raised by Roger are answered by the subject legislation. Surely, the majority's opinion is a well-reasoned attempt to balance § 25-21,185.10 with existing law. But in my view, the majority goes too far when it interprets the statute in ways that abrogate well-established principles—some statutory and some common law, some procedural and some substantive—without the Legislature's clear indication that such was the intended result. Based on current Nebraska law, the action below involved two separate proceedings which were tried together at the discretion of the trial court. There was no error in the jury's failure to determine Clinten's economic and noneconomic damages or to allocate negligence between Roger and Jack in Clinten's suit against Roger. Moreover, based on the pleadings, I believe the district court correctly entered judgment in favor of Clinten and against Roger for the full amount of Clinten's damages. Assuming arguendo that the suit by Roger against Jack required a determination of their respective percentages of negligence, it would have been solely for contribution purposes. While such results are not necessarily compatible with the majority's view of § 25-21,185.10, I believe they are the ones compelled by Nebraska's current jurisprudence. And compatible or not, I believe they are the results which must continue in such matters unless or until the Legislature specifically directs to the contrary.